In the Matter of the STATE of Minnesota, by Marilyn E. McCLURE, and her successor, Irene Gomez-Bethke, Commissioner, Department of Human Rights, Respondent (C4–84–771) Relator, (CX–84–936),

v.

SPORTS AND HEALTH CLUB, INC., d.b.a. St. Louis Park Sports and Health Club, et al., Relators, (C4–84–771) Respondents, (CX–84–936).

Nos. C4–84–771, CX–84–936.

Supreme Court of Minnesota.

May 17, 1985.

Rehearing Denied June 28, 1985.

See also, Minn.App., 365 N.W.2d 799.

Hubert H. Humphrey, III, Atty. Gen., Elizabeth V. Cutter, St. Paul, for State, et al.

Clyde F. Anderson, Minneapolis, for Sports and Health Club, Inc.

Heard, considered and decided by the court en banc.

KELLEY, Justice.

In this action against appellants Sports and Health Club, Inc. (Sports and Health) [1],

---

1. Arthur Owens, Marc Crevier, and Forest Larson, owners of Sports and Health Club, Inc. are also appellants. For convenience appellants

the respondent, the acting Commissioner of the Minnesota Department of Human Rights (Commissioner) sought to enjoin certain actions of the appellants. These actions consisted of questioning prospective employees about marital status and religion; terminating employees because of a difference in religious beliefs; refusing to promote employees because of differing religious beliefs; and failing to provide "open" public accommodations. The matter was heard by a hearing examiner who found that, in fact, appellants had engaged in the asserted practices in violation of Minn.Stat. ch. 363 (1983) (Minnesota Human Rights Act). The hearing examiner enjoined continuation of those practices. Throughout these proceedings, appellants have asserted that the Minnesota Human Rights Act, facially and as applied, unconstitutionally infringes upon their rights of freedom of speech, free exercise of religion, and freedom of association. In addition, appellants challenge the sufficiency of the evidence to sustain the hearing officer's findings and conclusions of law, and the hearing examiner's order certifying classes, which they claim violates the same constitutional rights. The respondent Commissioner challenges the hearing examiner's order refusing to certify certain classes. Since we conclude that the Minnesota Human Rights Act does not impermissibly infringe upon appellants' constitutional rights, either facially or as applied to appellants, we affirm the hearing examin-

er. Because the class certification was unduly narrow in scope, we reverse the class certification order.[2]

Arthur Owens, Marc Crevier and Forest Larson own and operate Sports and Health Club, Inc., a closely-held, for-profit Minnesota corporation. Sports and Health Club, Inc. operates seven sports and health club operations in the Twin Cities metropolitan area. Each provides recreational and exercise facilities as well as counseling regarding appropriate exercise programs for 18,000 members. Approximately 140 to 150 people are currently employed by the clubs. The parties agree that the clubs' facilities are excellent, described by some as the "Cadillac of the industry," and that membership dues are generally lower than those of the competition in the Minneapolis-St. Paul metropolitan area.

Owens, Crevier and Larson are "born-again" Christians. Their fundamentalist religious convictions require them to act in accordance with the teachings of Jesus Christ and the will of God in their business as well as in their personal lives. These convictions are deeply held, supported in Biblical scripture, and sincere.[3]

The owners of Sports and Health admit their religious practices and beliefs spill over into, and in fact require, their employment practices. These practices consist of questioning prospective employees about marital status and religion, terminating other employees because of a difference in

will be referred to as Sports and Health unless otherwise indicated.

2. The procedural history of this case is somewhat convoluted. Sports and Health first sought review before the Minnesota Court of Appeals which was granted. Subsequently, Sports and Health's petition for accelerated review was granted by this court. The Commissioner moved the Minnesota Court of Appeals to dismiss Sports and Health's appeal on the ground the hearing examiner's orders sought to be appealed from were not final, and therefore unappealable. Later the Commissioner filed her own appeal from the hearing examiner in the Court of Appeals challenging the ruling that three individual defendants did not aid and abet the corporate appellants and the denial of class certification. The Court of Appeals did not de-

cide these motions but reserved them until a hearing on the merits, but before being able to do so, the petition for accelerated review had been granted by this court. Later the Commissioner's petition to this court for acceleration of its appeal pending in the Court of Appeals and for consolidation with Sports and Health's appeal was granted. Meanwhile appellants moved to dismiss the Commissioner's appeal because she had failed to file a brief in her appeal within 30 days required by Minn.R.Civ.App.P. 131.01. Therefore, both motions to dismiss are before the court at this time.

3. The religious beliefs of the owners are clearly legitimate. In addressing the issues here presented, we have scrupulously given due deference and consideration to these beliefs in reaching our decision.

religious beliefs; refusing to promote employees because of differing religious beliefs; and failing to provide "open" accommodations. In some instances the practices were found illegal by the hearing examiner. In other instances, no allegations of illegality were asserted. In the operation of the clubs, the owners share an evangelical fervor to proselytize or convert others to their beliefs. The owners place book racks in the entrance of each club containing Christian literature. The state claimed no illegal conduct based on this action.

Interviews of all prospective employees, with the exception of locker-room attendants and babysitters, are conducted in violation of Minn.Stat. § 363.03, subd. 1(4)(a) (1982).[4] In those interviews, applicants were asked whether they attend church, read the Bible, are married or divorced, pray, engage in pre-marital or extra-marital sexual relations, believe in God, heaven or hell, and other questions of a religious nature. Sports and Health explains this practice as an attempt to advise prospective employees, during the interview, of the existence of the owners' fervent beliefs to determine whether their sincerely held beliefs may offend the prospective employee. Moreover, Sports and Health believes the answers to the questions will help the owners determine if the applicant (1) possesses a "teachable spirit" and (2) follows a "disciplined life style."

Sports and Health admits that only born-again Christians are permitted to be managers or assistant managers. The hearing examiner found this practice to be illegal under the Human Rights Act. Sports and Health justifies this rigid policy by relying on their religious belief that they are forbidden by God, as set forth in the Bible, to work with "unbelievers." (See 2 Corinthians 6:14–18). Sports and Health also admits that Bible studies are a substantial part of weekly meetings for managers. Voluntary Bible studies are also held for all sales personnel.

Finally, based on an interpretation of the Bible, Sports and Health will not hire, and will fire, individuals living with but not married to a person of the opposite sex; a young, single woman working without her father's consent or a married woman working without her husband's consent; a person whose commitment to a non-Christian religion is strong; and someone who is "antagonistic to the Bible," which according to Galations 5:19–21 includes fornicators and homosexuals. The hearing examiner found this practice to be in violation of Minn.Stat. § 363.03, subd. 1(2) (1984).[5] Sports and Health defended its hiring and firing actions on individual violations of rigid work rules based on the Bible (requiring a high degree of discipline and submissiveness),[6] "backbiting" and "non-joyful" attitude on the part of the employee, and in the case of applicants not hired, on the lack of a "teachable spirit" and "disciplined lifestyle," which the owners maintain are more important than a technical background in sales, exercise and/or nutrition.

Appellants assert the sincere belief that their practices were proper and lawful exercises of the rights of free speech, free exercise of religion and freedom of association guaranteed by the First Amendment to the United States Constitution and Article

---

**4.** Minn.Stat. § 363.03, subd. 1(4)(a) (1984) provides, in pertinent part, that "it is an unfair employment practice * * * [f]or an employer * * * to require [an applicant] to furnish information that pertains to * * * religion * * * sex, marital status * * *."

**5.** Minn.Stat. § 363.03, subd. 1(2) provides, in pertinent part, that "it is an unfair employment practice * * * [f]or an employer, because of * * religion, * * * sex, marital status * * *, (a) to refuse to hire * * * a person seeking employment; or (b) to discharge an employee; * * *."

**6.** For instance, the Clubs use a "book" system for sales. Some of the features of the "book" system imposed are: required "cold" calls to solicit potential members; a requirement to obtain a certain number of "referral" appointments (for prospective members) each week; requirements for the logging of "cold" calls and "referral" appointments; that each service of a member be recorded; that lists of clients and prospects be updated; that the members' programs be periodically updated; and recording of the periodic weighing and measuring of the members.

1, Section 16 of the Minnesota Constitution. This assertion forms the main contention in this case.

Despite all the discrimination allegations asserted in this case Sports and Health has employed, and continues to employ, married persons, male and female unmarried persons, and divorced males and females of various races. The Sports and Health clubs have also employed, and continue to employ, persons of various religious faiths —Jews, Roman Catholics, Protestants of various denominations, and others—so long as such other persons are not offended by the owners' faith, are not antagonistic toward the Christian gospel and will comply with management's work rules in a cheerful and obedient spirit.

(1) We address first the pending motions to dismiss.

(a) The Commissioner contends that Sports and Health's appeal from the hearing examiner's orders (C4–84–771) should be dismissed with respect to liability and class certification because the appeals are not from orders from which an appeal may be taken since they are not final within the meaning of Minn.R.Civ.App.P. 103.03. We need not address the issue in this case. We choose to grant discretionary review of the issues raised by Sports and Health's appeal because this is one of those "appropriate cases where the interest of justice requires immediate review of liability determinations before the issue of damages has been litigated." *In re Commodore Hotel Fire & Explosion Case*, 318 N.W.2d 244, 247, n. 2 (Minn.1982), *see also Sigler v. First American National Bank*, 325 N.W.2d 136, 137, n. 1 (Minn.1982). Sports and Health's appeal is before this court because we granted accelerated review. Rule 118 of Minn.R.Civ.App.P., providing for accelerated review, incorporates by reference the discretionary review found in Rule 117. The issues have been fully briefed in an adversarial proceeding. The interest of justice, in deciding all issues arising from the hearing examiner's order in one proceeding, compels us to the conclusion that discretionary review should be

granted, and, accordingly, the Commissioner's motion to dismiss is denied.

(b) Sports and Health contends the Commissioner's appeal (Case CX–84–936) should be dismissed because the Commissioner did not file her brief within 30 days as required by Minn.R.Civ.App.P. 131.01. In fact the Commissioner has never filed the relator's brief in that appeal. However, the Commissioner did brief issues she raised in her appeal in her brief responding to the brief of Sports and Health in appeal C4–84–771. We note that Sports and Health's dismissal motion is technically meritorious. Minn.R.Civ.App.P. 142.02. However, this court did grant the Commissioner's petition for accelerated review and consolidation of her appeal (CX–84–936), with Sports and Health's appeal (C4–84–771) and ordered counsel on oral argument to be prepared to discuss the substantive issues raised in each appeal. In fact, counsel did discuss all issues on oral argument, and, pursuant to leave of the court, Sports and Health did file a brief responding to issues raised by the Commissioner. Because no rights have been prejudiced, and since the parties have been given an opportunity to brief and argue the issues raised by the Commissioner, we will grant discretionary review of those issues in the interest of justice. *In re Commodore Hotel Fire & Explosion Cases, supra.*

■■■ (2) Turning to the merits, we address first Sports and Health's contention that the findings of fact, conclusions of law, and orders of the hearing examiner are "unsupported by substantial evidence in view of the entire record as a whole." Minn.Stat. § 14.69 (1982). In examining that contention, we are not permitted to substitute our view of the evidence for that adopted by the hearing examiner if substantial evidence in the record supports his decision. *See Dakota County Abstract Co. v. Richardson*, 312 Minn. 353, 356, 252 N.W.2d 124, 126–27 (1977). The test for determining whether a specific finding is supported by substantial evidence is whether the evidence, considered in its entirety, is (1) more than a scintilla of evidence; (2)

such that a reasonable mind might accept it as adequate to support a conclusion; or (3) more than "some evidence" and more than "any evidence". *Taylor v. Beltrami Electric Cooperative, Inc.*, 319 N.W.2d 52, 56 (Minn.1982). Where the evidence is conflicting or more than one inference may be drawn from it, the findings of the hearing examiner must be upheld. *City of Minneapolis v. Richardson*, 307 Minn. 80, 88, 239 N.W.2d 197, 202 (1976).

■ In a contested case such as this, the Commissioner must make a prima facie showing of discrimination as defined by Minn.Stat. 363.03 (1982). The employer then has the burden to establish legitimate nondiscriminatory reasons for the actions taken. The Commissioner then has the burden of establishing that the reasons stated are a mere pretext for discrimination. *Hubbard v. United Press International Inc.*, 330 N.W.2d 428, 441, n. 12 (Minn.1983).

■ In this case there are numerous charging parties.[7] In examining the claim of each charging party, the hearing examiner meticulously followed the procedure outlined in *Hubbard.* Several of the charges alleged that Sports and Health in its hiring practices violated the statute by making inquiry as to religious beliefs and practices and marital status. Other charges alleged that in promotion practices the same statutorily prohibited conduct occurred, while still others charged their employment was terminated because of their marital status and refusal to partake in religious classes at the place of business. Finally, one complainant, who was of the Jewish religious faith, alleges that she was forced to give up her membership in one of the clubs run by Sports and Health because Sports and Health, through its insistence upon displaying fundamentalist Christian religious literature in the literature racks and on the walls of the sports club, engaged in conduct that was offensive to her.

In considering each complaint, the hearing examiner found a prima facie showing of discrimination. Sports and Health then presented evidence in an attempt to establish a legitimate and nondiscriminatory reason for the action taken. Sports and Health proferred evidence that the employees who were terminated had trouble with the "book system" (the basis of the clubs' membership solicitation efforts); that they had a bad and uncooperative attitude, that they had violated rules such as the use of intoxicants on the premises or the unauthorized "borrowing" of money from certain club funds; or that they did personal business while on the job, contrary to company rules; as well as other claims of rule violations. In each instance, the hearing examiner held that Sports and Health had advanced legitimate and nondiscriminatory reasons for the discharges. Sports and Health likewise offered evidence articulating reasons why certain complainants were not hired such as their rejection of religion, their "bad attitude", or that their personality was not such as to demonstrate an ability to get along with people.[8] The hearing examiner found that these reasons for Sports and Health's actions were generally legitimate. However, in considering both the claims of promotional discrimination and hiring discrimination, the hearing examiner found the articulated reasons for the actions taken were pretextual and the real reasons related to the employees' or applicants' religious beliefs, or lack thereof, and/or their marital status. Had we been the fact finder, we might have arrived at a different conclusion in some of these cases, but the record is replete in demonstrating that each of the charging parties had been questioned about marital status, religion, and, indeed, in several instances "preached at" by officers of Sports and Health at the time of their termination or application denial. We recognize that in order to make informed and intelligent employment decisions, employers must be per-

---

7. A charging party is a person who claims he or she was illegally discriminated against by the employer.

8. One or two of this group, after being queried about attitude toward religion or marital status, did not pursue an employment application.

mitted some leeway to question an employee or applicant about his or her background, upbringing and perspective.[9] In this case, however, Sports and Health, in some instances, went far beyond legally permissible bounds in questioning applicants and employees. The evidence clearly substantiates the findings of the hearing examiner that questioning concerning religious beliefs, practices and concerning marital status permeated the employment process and were the true reasons for the actions taken by Sports and Health.[10]

(3) We come then to the crucial issue: do the findings of fact, conclusions of law and orders of the hearing examiner unconstitutionally infringe upon Sports and Health's freedom of speech, free exercise of religious beliefs, and freedom of association as provided by the First Amendment to the United States Constitution and Article 1, Section 16 of the Minnesota Constitution?[11]

(a) We address first a preliminary matter. The Commissioner, in her brief to this court, for the first time in this litigation raises the issue of whether Sports and Health has "standing" to raise the freedom to exercise religion issue. It is well settled that an issue not litigated below may not be asserted for the first time on appeal. *Matter of Welfare of K.T.*, 327 N.W.2d 13, 16–17 (Minn.1982); *Republic National Life Insurance Co. v. Lorraine Realty Corp.*, 279 N.W.2d 349, 355 n. 2 (Minn.1979). However, an objection to want of "standing" goes to the existence of a cause of action, is jurisdictional, and may be raised at any time, *Matter of Welfare of Mullins*, 298 N.W.2d 56, 61 n. 7 (Minn.1980). In this case, however, we conclude that Sports and Health (the corporation) has "standing" to

assert its constitutional arguments. The issue here is not whether a corporation has "standing" to litigate, but rather whether Sports and Health has "standing" to assert the first amendment as a defense to the claims of discrimination. The Commissioner's conclusory assertion that a corporation has no constitutional right to free exercise of religion is unsupported by any cited authority. Though not precisely on point, the United States Supreme Court has permitted employers, corporate as well as individuals, to assert first amendment rights. *See e.g. First National Bank of Boston v. Bellotti*, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) (freedom to speak on a referendum issue); *United States v. Lee*, 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982) (individual employer claimed that *his* rights of free exercise of religion were violated by a facially neutral governmental law—the Social Security Act). *See also Donovan v. Tony and Susan Alamo Foundation*, 722 F.2d 397 (8th Cir.1983), *aff'd*, —— U.S. ——, 105 S.Ct. 1953, 85 L.Ed.2d 278 (1985) (corporation asserted first amendment right of free exercise of religion in defense of alleged violation of minimum wage, overtime, and record keeping provisions of 29 U.S.C. 201 *et seq.*).

In this case, however, it is unnecessary to decide whether Sports and Health, a corporation, has a first amendment right to free exercise of religion. The hearing examiner pierced the "corporate veil" to make the respondents (Owens, Crevier and Larson), who own all the stock and assets of the corporation, liable for the illegal actions of it. Whether the hearing examiner had legal authority to pierce the "corporate veil" is not before us on this review.[12]

---

9. *See e.g.* 29 C.F.R. § 1604.7, 1605.3, 1606.6 (1984).

10. Justice Peterson, in dissent, argues that the discrimination claim predicated upon questioning of employees and applicants on cohabitation of unmarried persons is not a ground under the statute for finding discrimination. Even though we agree with his contention, yet the record appears clear to us that Sports and Health went far beyond permissible bounds in questioning employees and applicants in areas clearly prohibited by the act.

11. Both parties to this action have discussed in briefs and argument these three claims together. Although they are three distinct and separately guaranteed rights, the exercise of free speech in this case was pursuant to a deeply held religious conviction and the associational freedom that was exercised by Sports and Health was motivated by the same deeply held religious beliefs.

12. The "piercing" doctrine by legal reasoning requires the conclusion that the corporation and shareholders are one and the same (a mere

The fact remains that he did. By so doing, Owens, Crevier and Larson, in reality, are the ones asserting the first amendment right to the free exercise of religion. Thus, we conclude the Commissioner's "standing" argument presents no impediment to allowing the constitutional issue to be asserted in this case.

(b) Sports and Health argues that if the violations of the employment discrimination and public accommodation sections of the Minnesota Human Rights Act are sustained, such conduct is protected under the right to exercise religion under the United States and Minnesota Constitutions.[13]

▮ Because the State of Minnesota is neither attempting to regulate religious beliefs or to single out any particular religious belief for adverse treatment, the Minnesota Human Rights Act is a facially-neutral regulation. *See Wisconsin v. Yoder,* 406 U.S. 205, 220, 92 S.Ct. 1526, 1535, 32 L.Ed.2d 15 (1972).

▮ But that does not resolve the issue. When an individual's action, exercised under first amendment guarantees, violates a facially neutral regulation such as the Minnesota Human Rights Act, the courts follow a three step analysis to determine whether a constitutional exemption is required. Using that analysis, we first must determine whether the requirements of the Human Rights Act actually impose a burden upon Sports and Health's free exercise of religion. *See United States v. Lee,* 455 U.S. 252, 257, 102 S.Ct. 1051, 1055, 71 L.Ed.2d 127 (1982). Second, if such a burden is found to exist, it must be determined whether the burden is justified by a compelling government interest. *Bob Jones University v. United States,* —— U.S. ——, 103 S.Ct. 2017, 2035, 76 L.Ed.2d 157 (1983). Third, the court must determine whether the questioned regulation is the least restrictive means to achieve the state's goals. *Thomas v. Review Board of Indiana Employment Security,* 450 U.S. 707, 718, 101 S.Ct. 1425, 1432, 67 L.Ed.2d 624 (1981).[14]

"alter ego"); that the corporation was set up merely to serve as a "buffer" for the shareholders for one reason or another. Moreover, the hearing examiner worked from the assumption that Crevier, Larson and Owens were exercising their first amendment rights through Sports and Health. No corporate question was involved in hearing examiner's memorandum. Finally, Minnesota recognized the "reverse pierce" of the corporate veil in *Roepke v. Western National Mutual Insurance Co.,* 302 N.W.2d 350, 352 (Minn.1981) (court allowed sole shareholder to "pierce" corporate veil from inside-out to allow stacking of no-fault insurance coverages under policies).

**13.** The first amendment to the United States Constitution states:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for redress of grievances. U.S. Const. amend. I. The establishment and free exercise clauses apply to the states as a result of incorporation into the fourteenth amendment due process clause. *School District of Abington School District v. Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963).

Article 1, § 16 of the Minnesota Constitution is entitled "Freedom of Conscience; No Preference to be Given to any Religious Establishment or Mode of Worship" and provides:

The enumeration of rights in this constitution shall not deny or impair others retained by and inherent in the people. The right of every man to worship God according to the dictates of his own conscience shall never be infringed; nor shall any man be compelled to attend, erect or support any place of worship; or to maintain any religious or ecclesiastical ministry, against his consent; nor shall any control of or interference with the rights of conscience be permitted, or any preference be given by law to any religious establishment or mode of worship; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness or to justify practices inconsistent with the peace or safety of the state, nor shall any money be drawn from the treasury for the benefit of any religious societies or religious or theological seminaries.

**14.** In *United States v. Lee,* 455 U.S. 252, 257–59, 102 S.Ct. 1051, 1055–56, 71 L.Ed.2d 127 (1982), the United States Supreme Court formulated a slightly different three-part test. There, the first inquiry was whether the obligation imposed interferred with the free exercise right. The second question was whether the state justified the limitation on religious liberty by showing that it was essential to an overriding governmental interest. The final question was whether accommodating the religious belief would unduly interfere with fulfillment of this governmental interest. The test applied in *Lee* does not sub-

Accordingly, while the freedom to exercise religious beliefs is an absolute constitutional right, an individual's right to practice his or her religion, in certain circumstances, may be subject to reasonable governmental regulations if the government has an overriding compelling interest. *See Cantwell v. Connecticut,* 310 U.S. 296, 303–4, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940).

Here, the Commissioner concedes, and the record amply supports, that the employment actions taken by Sports and Health, through its sole owners, was the result of deeply held and sincere religious beliefs. Moreover, the Commissioner concedes that the Minnesota Human Rights Act abridges those beliefs. The Commissioner, however, contends that the abridgment is justified by the state's compelling interest in eliminating all forms of discrimination.[15]

The state's contention is buttressed by a number of recent decisions of the federal courts. *See Bob Jones University,* 103 S.Ct. at 2034–35 (fundamental overriding governmental interest in eradicating race discrimination can outweigh a person's right to exercise religious beliefs); *Roberts v. United States Jaycees,* — U.S. —, 104 S.Ct. 3244, 3253, 82 L.Ed.2d 462 (1984) (state's compelling interest in eliminating discrimination against women justifies the impact that the Human Rights Act may have on male members' associational freedoms); *Dayton Christian Schools v. Ohio Civil Rights Commission,* 578 F.Supp. 1004, 1034–35 (S.D.Ohio 1984) (intrusion on school's free exercise rights by investigation and potential administrative hearing justified by state's compelling interest in eradication of sex discrimination and employment); *Grosz v. Miami Beach,* 721 F.2d 729, (11th Cir.1983), *cert. denied,* — U.S. —, 105 S.Ct. 108, 83 L.Ed.2d 52

(1984) (city's interest in compliance with zoning ordinance sufficiently compelling to outweigh constitutional right to free exercise of religion). *See also United States v. Lee,* 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982); *Equal Employment Opportunity Commission v. Pacific Press Publishing Association,* 676 F.2d 1272 (9th Cir.1982). In each case the court balanced asserted constitutional rights against the governmental interest in seeking enhancement of civil rights of its citizens. This balancing most recently occurred in *Hishon v. King and Spaulding,* — U.S. —, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). In *Hishon* a law associate sued her former employer alleging that sex-biased discrimination caused the decision denying her elevation to partnership status in a law firm. In holding that Hishon's complaint stated a claim cognizable under Title VII, the court rejected the law firm's defense that application of Title VII would infringe upon the firm's constitutional first amendment rights of expression and association. In doing so the majority stated:

> Moreover, as we have held in another context, "[i]nvidious private discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment, but it has never been accorded affirmative constitutional protections." There is no constitutional right, for example, to discriminate in the selection of who may attend a private school or join a labor union.

*Id.* 104 S.Ct. at 2235 (citations omitted). Justice Powell, in concurrence, emphasized that laws banning discrimination may well infringe upon first amendment rights:

> The Court's opinion properly reminds us that "invidious private discrimination * * has never been afforded affirmative con-

---

stantially differ from the test set out in this text. Moreover, the Supreme Court returned to the test stated in the text in the *Bob Jones University* case.

15. In her brief the Commissioner asserts the state's interest is in securing for the state's citizens freedom from bigotry in employment whether bigotry is motivated by race, sex or, as

in the present case, religion. It is questionable whether the characterization of appellants' actions as "bigotry" is appropriate. *See Websters Third International Dictionary* (unabridged). In each instance, appellants relied on commands found in the New Testament of the Bible, which, if not followed, they claim, would condemn them to perdition.

stitutional protections." *This is not to say, however, that enforcement of laws that ban discrimination will always be without cost to other values, including constitutional rights.* Such laws may impede the exercise of personal judgment in choosing one's associates or colleagues.

*Id.* at 2236, n. 4 (Powell, J., concurring) (citations omitted and emphasis added). An examination of the foregoing cases clearly demonstrates that the government has an overriding compelling interest in prohibiting discrimination in employment and public accommodation. Each of the cited cases supports our balancing analysis. The rationale of those cases clearly undermines the claim that Sports and Health can hire and promote only "born again" Christians in management positions. *See also, Roberts v. United States Jaycees,* — U.S. ——, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). In a pluralistic and democratic society, government has a responsibility to insure that all its citizens have equal opportunity for employment, promotion, and job retention without having to overcome the artificial and largely irrelevant barriers occurring from gender, status, or beliefs to the main decision of competence to perform the work. Likewise, the government has a responsibility to afford its citizens equal access to all accommodations open to the general public.

■ But are there "less restrictive" means available to achieve this overriding governmental interest? The Commissioner asserts that this compelling state interest can only be advanced by enjoining Sports and Health and its sole owners from continuing the discriminatory practices. A less restrictive alternative might be to grant persons who deeply and sincerely hold sincere religious beliefs an exemption from the statutes, and, in essence, that is

what appellants argue. At the outset we note that the Minnesota Human Rights Act does contain exemptions, and, in particular, an exemption for religious corporations when religious beliefs shall be a bona fide occupational qualification for employment. Minn.Stat. § 363.02, subd. 1(2) (1984). Sports and Health, however, is not a religious corporation—it is a Minnesota business corporation engaged in business for profit. By engaging in this secular endeavor, appellants have passed over the line that affords them absolute freedom to exercise religious beliefs. The state's overriding compelling interest of eliminating discrimination based upon sex, race, marital status, or religion could be substantially frustrated if employers, professing as deep and sincere religious beliefs as those held by appellants, could discriminate against the protected classes. Other employers in the state engaged in secular business activities would be bound by the law, but those professing such convictions would not. We agree with the Commissioner that the state's overriding interest permits of no exemption to appellants in this case. Notwithstanding the fact that the Minnesota Human Rights Act as applied here infringes upon sincerely held religious beliefs and imposes upon the free exercise thereof, when appellants entered into the economic arena and began trafficking in the market place, they have subjected themselves to the standards the legislature has prescribed not only for the benefit of prospective and existing employees, but also for the benefit of the citizens of the state as a whole in an effort to eliminate pernicious discrimination.[16]

■ (4) In her appeal the Commissioner contends the hearing examiner erred in dismissing Owens, Crevier, and Larson, the sole owners of Sports and Health, from the

---

**16.** Were we to follow the dissent's conclusion, those "less Biblical minded" than the owner of Sports and Health, if they could demonstrate their beliefs were sincere and based on accepted theological concepts, would be permitted to discriminate contrary to the state's public policy of affording equality of opportunity and equal access to public accommodation to all its citizens.

To permit such an exception would substantially emasculate the state's public policy of ensuring civil rights for the citizens. Were we to accept Sports and Health's position, we might justly be accused of significantly encouraging private discrimination. *Cf., Reitman v. Mulkey,* 387 U.S. 369, 376, 87 S.Ct. 1627, 1631, 18 L.Ed.2d 830 (1967).

action. Originally, these three were named parties to this action on the theory that they aided and abetted Sports and Health in engaging in the discriminatory practices. *See e.g.* Minn.Stat. § 363.03, subd. 6 (1984). Although the hearing examiner did give as one reason for the dismissal what might be called a "good faith" exception based upon the sincerity of the beliefs of these three individuals, a ruling which is questionable, he also based the dismissal on the ground that the Commissioner had proved that the three individuals were, in fact, the corporation. He then pierced the "corporate veil," to hold them liable for the illegal actions of Sports and Health. Having done that, he held it was inappropriate to hold those individuals separately liable under the aiding and abetting subdivision of the Human Rights Act for actions which the corporation and they had already been held liable. By his act of piercing the "corporate veil" the legal basis for an aiding and abetting claim is nonexistent. *Cf. State v. Strimling,* 265 N.W.2d 423, 430 (Minn.1978). With that conclusion, we agree.

■■■ (5) The Commissioner sought class certification for all persons who had applied for employment with one of the clubs run by Sports and Health and who were required to furnish information regarding sex, marital status and religion. The hearing examiner refused to certify the class on the ground "it would be unduly burdensome and unfair to [Sports and Health and Owens, Crevier, and Larson] to include in the class any [such] persons * * * who cannot further prove that they were not hired because of one of those reasons." The Commissioner argues that insertion of a "fairness" consideration into the text for class certification under the Human Rights Act is an error of law.[17]

■■■ The appropriate test for class certification under the Human Rights Act is contained in Minn.Rule 5000.1100 (1983) (formerly Hum.Rts.Rule 107(e)). That rule, substantially like Minn.R.Civ.P. 23.01, pro-

vides that class certification is proper when there are questions of law or fact common to the class, there exists sufficient similarity of claims among class members, there is adequate representation of the class, and the respondent acted on grounds generally applicable to the class making injunctive relief appropriate. The hearing examiner ruled that the state established these criteria relative to all classes for which certification was sought. Therefore, a class of persons required to furnish prohibited information must be certified.

■■■ Rule 5000.1100 provides the hearing examiner no room for exercising discretion. Moreover, it is not in the province of the hearing examiner's power to determine what claims cannot be proven further. Had the examiner pinned his refusal to certify the class required to furnish information on one of the factors found in Minn. Rule 5000.1100, we might be faced with a different question. We conclude, on remand, the requested class should be certified.

We deny the Commissioner's motion to dismiss the appeal of Sports and Health. We deny Sports and Health's motion to dismiss the Commissioner's appeal. We affirm the hearing examiner's rulings that the alleged violations were proved by substantial evidence. We conclude that the Human Rights Act is not facially unconstitutional and that the state's overriding compelling interest in prohibiting discrimination in employment, while it does infringe upon the appellant's exercise of religious beliefs, is constitutionally permissible. We reverse the hearing examiner's order refusing to certify the class and remand for further certification proceedings consistent with this opinion.

COYNE, J., took no part in the consideration or decision of this case.

PETERSON, Justice (dissenting).

The issues presented in this case are of as profound importance as any raised in my

---

**17.** In reviewing issues of law, the reviewing court is not bound by the decision of the agency and need not defer to the agency's expertise.

*No Power Line, Inc. v. Minnesota Environmental Quality Council,* 262 N.W.2d 312, 320 (Minn. 1977).

18 years on this court, issues of important constitutional principle. Early in 1967, during my first term, a "fundamentalist" Christian activist, Gerda Koch, publisher of *Facts for Action*, made defamatory statements concerning the late Professor Arnold Rose; but, sensitive to the first amendment right of free speech and press, I wrote for a unanimous court to reverse a judgment for Rose. *Rose v. Koch*, 278 Minn. 235, 154 N.W.2d 409 (1967). Today, another "fundamentalist" Christian, Arthur Owens,[1] has been found guilty of violating various provisions of the Minnesota Human Rights Act, Minn.Stat. ch. 363 (1984), arising out of his determination to operate his business, Sports and Health Club, Inc., according to what he understands to be commandments declared in the Old and New Testaments constituting the Christian Bible. Being no less sensitive to the constitutional guarantees of religious freedom and free speech embedded in Minn. Const. art. 1, §§ 3 and 16, I would reverse the conclusions of law and orders of the departmental hearing examiner and dismiss these actions.

## I.

### *Owens' Religious Belief and Practice in a Secular Society*

This case is unique, as the hearing examiner (hereafter examiner) observed, because a statute designed to protect the religious from discrimination has been invoked by the nonreligious or merely nominally religious against Owens, a man of strong religious belief and commitment. The important issues in this case cannot be fully understood without understanding Owens himself.

1. The formal party against whom complaint was made is Sports and Health Club, Inc., doing business at seven locations in the Minneapolis-St. Paul metropolitan area. Its officers are Arthur Owens, president and chief executive officer, and Marc Crevier and Forest Larson, vice presidents. Owens, whose religious and business philosophy is fully shared by the vice presidents, is the founder and dominant figure of the corporation. For convenience only, therefore, with isolated exceptions, references will be to

Owens is, by his personal confession, a Christian. A "Christian," of course, is one who professes belief in the religion of Christianity. The centuries-old Apostles' Creed, a statement of the main Christian beliefs in use as early as A.D. 150 and still in use throughout Christendom by both Roman Catholics and Protestants, recites:

I believe in God the Father Almighty, Maker of heaven and earth; And in Jesus Christ his only Son our Lord; who was conceived by the Holy Ghost, born of the Virgin Mary, suffered under Pontius Pilate, was crucified, dead, and buried; He descended into hell: the third day He rose again from the dead; He ascended into heaven, and sitteth on the right hand of God the Father Almighty; from thence He shall come to judge the quick and the dead. I believe in the Holy Ghost; the holy catholic Church; the communion of saints; the forgiveness of sins, the resurrection of the body; and the life everlasting. Amen.

The Nicene Creed, similar in its Christology and adopted in A.D. 325, is used by the Eastern Orthodox Churches.[2]

Justice William Brennan has taken judicial notice of the "characteristically Christian belief" that a Divine Saviour was brought into the world and that the purpose of His miraculous birth was to illuminate a path toward salvation and redemption, "an exclusive, precious and holy [path]."[3] If these are basic beliefs of Christians, they are obviously fundamental.

Owens described his basic Christian belief in more particularized terms: "born again," "evangelical," and "fundamentalist." They are terms that, for many, have created a stereotype to which negative reactions range from amusement or bemuse-

Owens rather than to the vice presidents or the corporate name.

2. *See Apostles' Creed* and *Nicene Councils* in The World Book Encyclopedia, Notes by the late Archbishop Fulton J. Sheen.

3. *Lynch v. Donnelly*, —— U.S. ——, 104 S.Ct. 1355, 1377, 79 L.Ed.2d 604 (1984).

ment to outright hostility [4]—a climate in which the fundamental issues in this case were not, and are not likely to be, given appropriate consideration.

The words "born again" came from the lips of Jesus Christ to Nicodemus as reported in the Gospel according to John.[5] Then, as now, those words signified a conversion—a conscious change in belief or, according to *Webster's Third New International Dictionary* (1961) (hereafter *Webster's Dictionary*), a "spiritual regeneration." The words "born again" and the possibly more comfortable word "renaissance" derive from the same French word, "renaitre," *id.*, and both are substantially synonymous with an entire "nation under God [having] a new birth of freedom," as Lincoln spoke the words at Gettysburg.

The most dramatic and radical born-again experience recorded in the New Testament is probably that of St. Paul who, en route to Damascus to persecute early Christians, had a Divine encounter and was converted into the greatest of Christian missionaries. *Acts* 9:1–30; 22:3–16. No less radical, if less dramatic, was the earlier experience of Peter (together with Andrew, James, and John), who abandoned his fishing nets to follow the Stranger who said, "Come with me and I will teach you to catch men." *Matthew* 4:18–22. Norman Vincent Peale, in an October 3, 1984, dialogue on CBS television, said that he had been born again in a "traditional way" but that not everyone does or must experience it in the same way as he had. Owens, who testified concerning his own born-again experience in 1957, described what it meant to him:

> It means that really the experience with Jesus Christ which is a personal relationship with a risen Lord, controls my life, my attitude, the way I operate in my home, the way I operate in interpersonal relationships and the way I operate in business.

Owens is an "evangelical" Christian. "Evangel," according to *Webster's Dictionary*, refers to "glad tidings" or "the Christian gospel." The verb, "evangelize," is defined as "to instruct in the Gospel; to * * * convert to Christianity." A final command of Jesus to his eleven disciples was "[g]o, then, to all peoples everywhere and make them my disciples." *Matthew* 28:19. They did, and changed the world; Owens did, and changed his business.

Owens, finally, is a "fundamentalist" Christian. The words of the Founder of Christianity can be nothing less than fundamental. But to Owens and other "fundamentalists," to be a fundamentalist Christian encompasses a belief that both the Old and the New Testaments, in their original texts, are *verbally* inspired of God (citing *Matthew* 5:17–18, 2 *Timothy* 3:16–17, and 2 *Peter* 1:21 and 3:16) and accordingly are inerrant and the complete and supreme authority in faith and life.

It is not for an administrative agency or this court to assess the legitimacy of Owens' belief or undertake an exegesis of the Scripture passages upon which it is based. It is enough to acknowledge that it is Owens' belief and one shared by hundreds of

---

**4.** The special assistant attorney general exemplified this last reaction when she harshly dismissed Owens' faith in practice as an example of "extreme bigotry," which may explain the unusual vigor with which the complaints have been prosecuted.

**5.** *John* 3:1–6 reads:
There was a man named Nicodemus, a leader of the Jews, who belonged to the party of the Pharisees. One night he came to Jesus and said to him: "We know, Rabbi, that you are a teacher sent by God. No one could do the mighty works you are doing unless God were

with him." Jesus answered, "I tell you the truth: no one can see the Kingdom of God unless he is born again." "How can a grown man be born again?" Nicodemus asked. "He certainly cannot enter his mother's womb and be born a second time!" "I tell you the truth," replied Jesus, "that no one can enter the Kingdom of God unless he is born of water and the Spirit. Flesh gives birth to flesh, and Spirit gives birth to spirit."
All New Testament Scriptural quotations are from the Good News for Modern Man version, received in evidence as a joint exhibit.

thousands of similar believers.[6] Our duty is to recognize that belief and at least respect his right to it. The freedom of belief in matters religious, whether or not the belief is shared by others, is constitutional fundamentalism; however, acknowledging the freedom to believe but denying a concomitant freedom to communicate and put beliefs into practice is essentially oxymoronic.

### The Outreach of Owens' Faith in the Marketplace

This is a general statement of how Owens applied his religious convictions to the operation of his business. The particularized findings of fact and conclusions of law of the examiner, which raise more than constitutional issues, will be discussed further in Part III.

Following his religious conversion, as well as two periods of imminent bankruptcy, Owens resolved to conduct his business as an evangelical, fundamentalist "discipleship." This was augmented by improved secular business practices not inconsistent with that discipleship. The business prospered, and Owens attributed the "turnaround as being the result of God's working in the management of [his] business."

Both club members and employees were made aware of this business posture. A 14-foot-wide sign, with an unrecorded Scriptural quotation, hangs in the main office. Evangelistic Christian placards, pamphlets, magazines, and books—some free and others for sale—are placed in the lounges and other public areas of the several clubs. Bible study classes during the afternoon shift change are made available to all employees; one study leader was identified as a woman managerial employee of Roman Catholic faith, and other managerial leaders, including Owens and Crevier, apparently are Protestants. A chapter of Toastmasters International was established, and sales personnel are required to attend; as required by the charter of the international organization, all sessions start with prayer, and members deliver speeches of their own choosing, frequently on subjects religious in nature.[7] Exclamations of joy—like "Hallelujah!" or "Praise the Lord!" (see Psalm 148)—by employees are not uncommon. This working environment—indisputably a matter of lawful business judgment—was explained to applicants for employment. One purpose of this explanation was to determine whether the prospective employee would be "antagonistic" or offended by such working conditions.[8]

Owens—or sometimes one of the vice presidents if managerial employees were not involved—undertook, in addition, to learn if an applicant had a "teachable spirit" and a "disciplined lifestyle," somewhat

6. The 1985 Statistical Abstract of the United States reports latest census data as showing that religious membership totals 139.6 million Americans. See *infra* note 18 for a survey showing actual church attendance in the United States and Minnesota.

7. Similar motivational-public speaking courses, *sans* opening prayer, are sponsored by the Dale Carnegie Institute. Lee Iacocca, formerly managerial giant of Ford Motor Company and now of Chrysler Corporation, writes in his best-selling autobiography: "Management is nothing more than motivating other people," and "I've sent dozens of introverted guys to Dale Carnegie [Institute courses] at the company's expense. For most of them it made a real difference." L. Iacocca, *Iacocca: An Autobiography* 53–54 (1984).

8. The following testimony of Nessa Moldo is illustrative:

Q. Did [Owens], during the course of [your] employment interview, make you aware of his religious beliefs, the fact that he was a Christian man and was running his business according to the Christian principles?
A. Yes.
    *    *    *    *    *    *
Q. Did he ask you whether that would be a problem with you?
A. Yes.
Q. What did you answer?
A. I said I had no problem with that. And then [I] asked him if he would have a problem with my being Jewish and working for him.
Q. And what did he say?
A. No. No problem.
    *    *    *    *    *    *
Q. So you came to work?
A. Right.

interchangeable attitudinal terms. "Discipline" and "disciple," according to *Webster's Dictionary*, have a common connection to the word "teachable." These objectives involved inquiry into family and marital status, for two reasons: first, if it revealed an immoral relationship, Owens was not willing to subsidize it with employment; second, if the applicant came from a disciplined home environment, it revealed a favorable likelihood that the applicant had learned submission to authority, acceptance of a task to be done, and capacity to complete that task.[9] Owens considered that employees who resisted authority and instruction demonstrated, in Owens' words, a "lack of *enthusiasm*. They're not able to do, and they don't want to do, these task things to reach the goals that we have set for them." [10] (Emphasis supplied.) Owens believes, not surprisingly, that a person's religion—if any—"permeates, motivates, and directs every thought and action of that person's life," private and public.

It is undisputed that no person will be initially employed in or subsequently promoted to a *managerial* position unless he or she is a "born again" and "growing" Christian. Unlike non-managerial employees, attendance at Bible study sessions is mandatory. Owens' Scriptural basis for this standard is in St. Paul's words of counsel to members of the church in Corinth:

> Do not try to work together as equals with unbelievers, for it cannot be done. How can right and wrong be partners? How can light and darkness live together? How can Christ and the Devil agree? What does a believer have in common with an unbeliever?

2 *Corinthians* 6:14–15.

The religion-related standards for managerial employees are the most pronounced and conspicuous of those found by the examiner as violative of the anti-discrimination statute. Commonsense and common law, however, should make them the least subject to sanction. All employees, to a lesser or greater extent, have a fiduciary relationship to their employers, *Restatement (Second) Agency* §§ 1, 2, 13 (1957), with a duty to act in the interests of the employer and not as an adversary. This principle has been greatly diminished in the decades following the enactment of modern labor relations laws, but it is most significant that those statutes uniformly exempt managerial employees from adversarial collective bargaining relationships. The federal Labor-Management Relations Act, 29 U.S.C. § 152 (1976), in its definition of "employee," expressly excludes "any individual employed as a supervisor." Although the statute makes no mention of "managerial employee," it is construed, *a fortiori*, to exclude them as well. *See N.L.R.B. v. Bell Aerospace Co.*, 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974). As stated in *N.L.R.B. v. Yeshiva University*, 444 U.S. 672, 682, 100 S.Ct. 856, 862, 63 L.Ed.2d 115 (1980), both exemptions grow out of the same concern: that an employer is entitled to the undivided loyalty of its representatives. The Minnesota Labor Relations Act does not contain a specific definition, but Minn.Stat. § 179.16, subd. 2 (1984), provides that "[s]upervisory employees shall not be considered in the selection of a bargaining agent." Paul W. Goldberg, the present director of the Minnesota Bureau of Mediation Services, and his predecessor, Peter E. Obermeyer, confirm that units of managerial employees have never been certified for collective bargaining purposes with a private employer in Minnesota. The

---

**9.** Owens thought a person from a Catholic farm family was, on this basis, a most promising prospect.

**10.** "Enthusiasm" is defined by *Webster's Dictionary* in its archaic form as "inspiration by a god or other superhuman power" or, in modern usage, as "strong excitement of feeling on behalf of a cause or subject." Many years ago Frederick Williamson, then president of New York Central Railroad, told Dale Carnegie: "The longer I live the more certain I am that enthusiasm is the little-recognized secret of success. * * * [I]f two men are nearly equally matched, the man who is enthusiastic will find the scales tipped in his favor. And a man of second-rate ability *with enthusiasm* will often outstrip one of first-rate ability *without enthusiasm*." *The Dale Carnegie Course* 66–67 (Dale Carnegie Publishers, Inc. 1955) (emphasis in original).

commonsense of these statutes, and commonsense without statutes, is that no business person would wish or should be required to be associated at the critical managerial level with a person who rejects the basic operational objectives and philosophy of the business enterprise.

The point just stated can be illustrated by the hypothetical example of two not-so-hypothetical Minnesota business corporations that sell books and other publications but that have radically different business philosophies. Corporation A operates stores selling predominantly religious publications, openly displayed in sections bearing such descriptive signs as "Bible Commentaries," "Bible Stories for Children," and "Theology"; corporation B operates stores selling only secular books and magazines, including a large number of so-called "adult" books and magazines. I pose what are to me self-answering negative answers to these questions: Should corporation B be required to employ as a *clerk* an evangelical Christian who would find that working environment offensive? Should corporation A be required to employ an atheist who would find its working environment at least uncomfortable and who very probably would be reluctant to read any such books for the purpose of discussing and answering inquiries from interested customers? It is unthinkable that corporation B should be required to employ a branch or general *manager* who would be in a position actually to discourage the sale of materials he or she thought pornographic, just as corporation A should not be required to employ in a managerial position one who would convey his or her disinterest or disdain to its employees or customers. This being so, it makes absolutely no sense to forbid the asking of a religion-related question that would disclose these basic incompatibilities, unless the even more absurd answer were to be that the person should be hired first,

without such inquiry, and only later discharged for nonperformance of the duties of loyalty and performance owed the employer at either place of business.

### The Propriety of Religious Discipleship in a Secular Society

The examiner's disposition of the basic issue in this case was as sweeping as it was superficial: Owens' religious beliefs are sincere but, when put into practice in a commercial service business, simply irrelevant.[11] To say, as the examiner said, that "[t]he essence of the employer's business is not a 'discipleship for Christ' * * * but rather the operation of an exercise emporium" is impermissibly to substitute the examiner's business judgment for Owens' business judgment. The examiner, at the same time, decrees a dichotomy between Owens' beliefs and practices, divorces the sacred from the secular, does not distinguish praying on one's knees on Sunday from preying on other persons in the marketplace on Monday, and perceives no significant difference between the commitment of conviction and the detachment of a possibly more casual Sabbath ceremony or community convention.

The examiner's view seems to reflect what Harold J. Berman, James Barr Ames Professor of Law, Harvard University, calls "[t]he fundamental changes that have taken place in our legal institutions during the past two generations [as] part of a transformation of the entire Western legal tradition, marked particularly by its disconnection from the religious foundations upon which it was built." He concludes:

[A]s a matter of historical fact the legal systems of all the nations that are heirs to the Western legal tradition have been rooted in certain beliefs or postulates: that is, the legal systems themselves

11. The attorney general's declaration that "extreme bigotry" and "extreme intolerance" are the essence of this case is not only irrational, but cynical. "Bigotry" is defined by *Webster's Dictionary* as "obstinate and unreasoning attachment to one's own belief * * * with intolerance of beliefs opposed to them." If Owens' Christian conviction is "bigotry," the same may be said of Orthodox Jews, Muslims, Hindus, and others who believe theirs is the true religion. Still worse, it comes close to defaming Jesus for saying, "I am the way, I am the truth, I am the life; no one goes to the Father except by me." *John* 14:6.

have presupposed the validity of those beliefs. Today those beliefs are postulates—such as the structural integrity of law, its continuity, its religious roots, its transcendent qualities—[which] are rapidly disappearing not only from the minds of philosophers, not only from the minds of lawmakers, judges, lawyers, law teachers, and other members of the legal profession, but from the consciousness of the vast majority of citizens, the people as a whole; and more than that, they are disappearing from the law itself. The law is becoming more fragmented, more subjective, geared more to expediency and less to morality, concerned more with immediate consequences and less with consistency or continuity.[12]

Contemporary theologians of national scholarly stature address more cogently the premise advanced in this Part I, preliminary to reaching the fundamental constitutional issue in all these cases.

Martin E. Marty, Ph.D.,[13] wrote in *U.S. News & World Report:*

We tend to underestimate the power of religion in people's lives, because for many years in America religion had become a private affair. * * * I do not believe in turning schools into churches, but our children would be well served by courses teaching about the role of religion in human life. Schools should teach reality, and media should cover reality; yet we've largely screened out the reality of religion in society. A youngster can watch 15 years of children's TV and learn about the mailperson and the grocer but never see a rabbi, monk or minister. * * * The group I would regard as

the next frontier for religion is that huge class of young adults—the high-rise, high-tech people—who devote tremendous energies to their careers and take the pressure off through a kind of hedonism. There are religious stirrings among them, yet few of them are attracted to established churches. This group and millions of other Americans are likely to pursue religion entirely privately, which can be a fine expression of personal freedom but a problem when it comes to reaching people and reforming society. U.S. News & World Report 46 (Sept. 24, 1984).

Peter J. Gomes, Ph.D.,[14] writing in the *Minneapolis Star and Tribune*, Oct. 12, 1984 (Commentary) at 19A, wrote:

In what we like to describe as our secular and pluralistic republic, our problem is with those who now appear unwilling to leave well enough alone in the business of religion. The "problem" with religion, of course, is the religious, those who take it seriously, those who are unwilling to be among Swift's "Anythingarians." They know what Edmund Burke meant when he wrote, "Nothing is so fatal to religion as indifference, which is, at least, half infidelity." To such as these, a general religion is no religion at all.

James Hitchcock, Ph.D.,[15] in an October 1984 address at Hillsdale College, reported in its February 1985 issue of *Imprimis*, said:

In recent years there has been a coming together of Catholics and Evangelicals motivated by a growing recognition of the threats to Christianity itself

---

**12.** *Religious Foundations of Law in the West: An Historical Perspective*, 1 J.L. & Relig. 3, 3, 41–42 (Summer 1983).

**13.** Dr. Marty is an ordained Lutheran clergyman and a professor of Modern Church History, University of Chicago. He is publisher of *Context*, a commentary on religion and culture, and associate editor of *Christian Century* magazine.

**14.** Dr. Gomes is an ordained clergyman in the American Baptist Church. He is Plummer Pro-

fessor of Christian Morals, Harvard University, and Minister of Harvard's Memorial Church. *Time*, Dec. 31, 1979, at 67, listed him among its selection of the seven greatest preachers in the United States.

**15.** Dr. Hitchcock is Professor of History, St. Louis University, a Jesuit school. He chairs the Catholic League for Religious and Civil Rights. He is past president of the Fellowship of Catholic Scholars and former editor of *Communio*.

posed by both the secular culture and by liberal Christianity.

Liberal Christianity can be defined as the assumption that religion is under an obligation to adapt itself completely to changing cultures. Ultimately, it does not believe in transcendent divine revelation but conceives religion as born of the on-going "religious consciousness" of the human race. Virtually everything in religion, including finally even God, is regarded as a human creation, which human beings therefore can, and even must, change in order to meet changing human needs. By contrast, orthodox Christians believe that the source of their religion is God's self-revelation of Himself to His people.

It is at this point * * * that the widest gulf exists in contemporary Christianity. It is not a gulf which runs between denominations, but cuts across practically all denominations, running through the middle of many.

Richard John Neuhaus,[16] interviewed in the *National Catholic Register* (reprinted in *The Presbyterian Layman* 10 (Nov./Dec. 1984)), gave this answer to the question, "How can Christians instill Biblical values into a pluralistic society?":

What we need in this society more than anything else, is exemplary communities of Christian virtue, both private and public. Secondly, Christians should be uninhibited in articulating their beliefs in the public arena. The third task, which is terribly important, is to find points of agreement with those who are not motivated by the same biblically based values that motivate us.

Orthodox Judaism, no less than Christianity, has no sterile dichotomy like that imposed by the examiner as dispositive in this case. Milton Steinberg,[17] in his excellent book for non-Jews, *Basic Judaism*, writes:

Judaism, being more than a church, is broader in its interests than theology and ethic. It is, in fact, no less than a full way of life. Wherefore it seeks to mold not only the beliefs, morals, and worship of the Jew, but his every act, his eating, drinking, work and play. Ritual is the instrument designed to this end, carrying the Jewish religion into every nook and cranny of his being until nothing he does is untouched by Judaism.

M. Steinberg, *Basic Judaism* 136 (1947).

The above-quoted views of professionals occupying prestigious positions in academia and pulpits in the United States are confirmed by parishioners in the pews of Minnesota churches. The Institute for Ecumenical and Cultural Research, located on the premises of St. John's University, Collegeville, Minnesota, recently undertook a 5-year, $200,000 study "to learn how Christian faith affects the lives of church members in Minnesota, in order to gain information concerning the internal condition of the churches and their relation to society." The nature of the study and its extensive findings were published in a 1983 book entitled *Faith & Ferment: An Interdisciplinary Study of Christian Beliefs and Practices* (hereinafter *Faith & Ferment*), edited by Robert S. Bilheimer, a Presbyterian minister and executive director of the Institute. The study consisted of questionnaires sent to some 2,000 church members and ministers in various denominational churches in demographically representative counties, followed by intensive personal interviews with, among others, several of those who had responded to the questionnaires. The study was an interdisciplinary collaboration, with the design of the inquiry developed by a professional group of anthropologists, sociologists, and psychologists from the University of Minnesota.[18] Sister Joan D. Chittister, O.S.B.,

---

**16.** Mr. Neuhaus is a Lutheran clergyman, commentator, and civil rights activist.

**17.** Rabbi Steinberg received his Master's Degree in Philosophy from Columbia University and an honorary degree of Doctor of Hebrew Letters from the Jewish Theological Seminary of Amer-

ica. He was Rabbi at the Park Avenue Synagogue in New York until his death in 1950.

**18.** To obtain a random sample of active church members, the project employed a two-stage sampling design to determine which members

Ph.D., the project coordinator and a professional consultant to religious organizations, prepared a unified presentation of the project's major findings, which appears in the first part of *Faith & Ferment.* The next part of *Faith & Ferment* presents a historical and theological analysis of the data by Dr. Martin E. Marty, a co-producer of the project, followed by a third part made up of supplemental essays by lay and clerical members of the Institute. Veteran religion reporter Willmar L. Thorkelson, a lay member of the Institute, said, " 'Monumental' is the word that journalists would use to describe [it]." *Faith & Ferment* at 273. It is a study that has not been replicated in any of the other states.

The most important finding, as reported in *Faith & Ferment:*

> In the minds of these respondents, work and faith are clearly interrelated. More

than three-fourths of them (79%) see their work as being in harmony with their Christian faith. Some (13%) say that the work they do for a living has little or nothing to do with their faith. Few (7%) believe that what they do to earn their livelihood conflicts with their faith. But regardless of their answers, most of them see faith as an acceptable and intelligent guide in the marketplace. It directs their conduct in their daily work. Many (81%) try to be an example for Christ while at work. And in a society that urges people to keep a proper distance between their religious convictions and their public activities, faith requires a surprising number (39%) to tell others on the job about Christ. * * * [O]ne thing is all but certain: whatever is going on in the American marketplace is perceived by Christians in Minnesota to be within the purview of faith.[19]

should receive questionnaires. The first stage used the same seven geographical regions employed in the reporting of state vital statistics; for the second stage, two adjacent counties within each region were selected at random to serve as sampling domains for the study. Churches within these counties were then chosen randomly from phone lists in such a way as to ensure representation from each region proportional to its population. In all, 210 churches were selected and the pastor at each was asked to select 10 members of his or her congregation. When the initial solicitation failed to elicit a sufficient number of replies, an additional solicitation was mailed to 210 alternate churches that had been chosen from the telephone directories in anticipation of such a contingency. These alternate churches were selected from a different set of 14 counties chosen in the manner previously described. *Id.* at 334–35. In addition to questionnaires, 101 personal interviews were conducted. A portion of the interviewees were drawn from those who returned questionnaires and others were drawn from those who expressed interest. *Id.* at 12–13.

The survey therefore obviously was not based upon a more exact statistical sampling, as in a Gallup Poll, and the answers of respondents may be skewed by the nature of the questions asked in the in-depth interviews. Nonetheless, designers of the project concluded that "[t]he data presented * * * provide a reliable base upon which to achieve the stated aim of Faith [&] Ferment: 'to produce hypotheses of weight concerning the dimensions, the problems and promise of the present situation.' " *Id.* at 337.

The Gallup Poll annually surveys church attendance by adults in five selected weeks—asking the question, "Did you, yourself happen to attend church or synagogue in the last seven days?"—using a statistically more valid sample of the adult population within four regions of the United States but without illuminating more than the single fact of attendance. The most recent poll, released December 20, 1984, showed these percentages of attendance: South, 44; Midwest, 42; East 38; West 33. The *Faith & Ferment* project concentrated on the attitudes of those who were identified as churchgoers, but added more information concerning the extent of their attendance: "[h]alf of them report that they go [to church] at least once a week * * * [a]lmost half (49%) said that they watch religious programs on TV at least twice a month. These are not people who describe the value of church without going to any." *Id.* at 79.

**19.** *Faith & Ferment* at 133–35. There were other specific findings that are relevant to the issues discussed at various points in this opinion, including Parts IV and V, among them these:

> [T]he church members who participated in this study claim that family worship at home is a regular and even frequent part of their lives. Over two-thirds (67%) pray at meals "most always." Almost half (48%) say they worship at home as a group every single day by reading Scripture or some spiritual book, with the rosary, or in family night prayer. Twenty-five percent reported that they never pray as a family or, if they do, make it a practice only on holidays. * * * For most Catholics, Evangelical Covenant members, Lutherans, and Baptists in the sample (51%–68%), family worship is reportedly a daily exercise.

## II.

### The Statutory and Constitutional Focus of the Human Rights Act

Minn.Stat. § 363.03 (1984)—subject to a prefatory exception for bona fide occupational qualifications—contains a statutory subdivision declaring the following employment practices of an employer to be unlawful and prohibited discriminatory acts: requiring an applicant for employment to furnish information that "pertains" to religion, sex, or marital status (subdivision 1(4)(a)); refusing to hire an applicant for employment or maintaining a system of employment which "unreasonably" excludes a person seeking employment because of religion, sex, or marital status (subdivision 1(2)(a)); and discharging an employee or discriminating against an employee with respect to upgrading of position because of religion, sex, or marital status (subdivision 1(2)(c)). Minn.Stat. § 363.03, subd. 3, additionally prohibits denying full and equal enjoyment of the facilities of a place of public accommodation because of religion or sex, and a violation of this subdivision is declared to be a misdemeanor. Minn.Stat. § 363.101 (1984). The text of these provisions, in relevant part, is set forth in the margin.[20]

The Minnesota Constitution deals in direct terms with the validity of the Human Rights Act, both in its text and as applied in this case. Declaring in its Preamble that

---

*Id.* at 26.

Almost every respondent (95%) said that the Bible is in some authoritative sense the Word of God and that this is a necessary belief for all Christians. It was not surprising, then, to find that a large portion of the Christian community (77%) felt strongly that reading the Bible is important for the development of their spiritual lives. Almost all the respondents (92%) credited the reading of the Bible as having at least some importance for their spirituality. Even 59% of the Roman Catholics, for whom Bible Study has not been the focus of spiritual formation, were convinced that the Bible is essential to their personal spiritual development.

\*　\*　\*　\*　\*　\*

Forty-one percent of the respondents surveyed believe that in the Bible "people report verbally what God said and that the Bible in the original text contained no errors."

\*　\*　\*　\*　\*

In general, then, these Christians believe that God is present in time and that their lives are marked and managed by a divine love and will, that prayer and Scripture link the mind of God and the matter of life, and that the Christian message is determinative for the salvation of the world. \*　\*　\*

Consequently, perhaps, their sense of personal accountability is high.

*Id.* at 66–77. Jerome P. Theisen, O.S.B., S.T.D., Abbot of St. John's Abbey, Collegeville, Minnesota, echoed similar observations by others of the Institute: "What is particularly striking in the data is the high incidence of the practice of prayer and the remembrance of God. \*　\*　\* God is active in the very midst of work and leisure, love and anxiety, decisions and problems. \*　\*　\* One fact is clear: the Christians of Minnesota want and expect to be involved in matters that extend beyond the walls of the church building." *Id.* at 296–99.

**20.** The Minnesota Human Rights Act, by the following clauses of Minn.Stat. § 363.03, subd. 1 (1984), forbids the following:

Except when based upon a bona fide occupational qualification, it is an unfair employment practice:

\*　\*　\*　\*　\*　\*

(2) For an employer, because of race, color, creed, *religion*, national origin, *sex, marital status*, \*　\*　\* disability, or age,

(a) to refuse to hire or to maintain a system of employment which *unreasonably* excludes a person seeking employment; or

(b) to discharge an employee; or

(c) to discriminate against an employee with respect to his hire, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment.

\*　\*　\*　\*　\*　\*

(4) For an employer \*　\*　\* before a person is employed by an employer \*　\*　\* to

(a) require the person to furnish information that pertains to race, color, creed, *religion*, national origin, *sex, marital status* \*　\*　\* Minn.Stat. § 363.03, subd. 3 (1984), prohibits the following:

It is an unfair discriminatory practice:

To deny any person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation because of race, color, creed, religion, disability, national origin or sex. \*　\*　\*

Minn.Stat. § 363.101 (1984) provides:

In addition to all other remedies provided under this chapter, every person who commits an unfair discriminatory act as set forth in section 363.03, subdivision 3, or aids, abets, incites, compels, or coerces another to do so, shall be *guilty of a misdemeanor.*

(Emphasis supplied.)

it was ordained and established in gratitude to God for our civil and religious liberty and to secure its blessings for posterity, it guarantees in article 1, section 16, every person's freedom from "control of or interference with the rights of conscience." By article 1, section 3, it guarantees the right of all persons to freely speak their sentiments on all subjects. The full text of these two sections of the Minnesota Bill of Rights is set out in the margin.[21]

### The Three-part Factors of Constitutional Analysis

The state acknowledges that a three-step analysis should be undertaken when a statute is challenged as infringing upon these fundamental interests, namely: (1) whether the statute imposes a burden upon the free exercise of those rights; (2) if so, whether the imposition of that burden is justified by a compelling and overriding government interest; and (3) even so, whether the challenged statutory proscriptions are the least restrictive means to achieve the state's objectives.

The function of the examiner was a schitzoid one, which accounts for the unbalanced result in this case. On the one hand, section 363.11 of the Human Rights Act, in its interpretation and application, directs that the provisions of the Act "shall be construed liberally for accomplishment of the purposes thereof," and section 363.12, subd. 1, declares it to be the public policy of this state "to secure for persons in this state freedom from discrimination." Responsive to that mandate upon the administrative agency—and without power to determine issues of constitutional law—the examiner, by his findings, conclusions, and orders, interpreted the statute not only in a "liberal" fashion but in a remarkably extravagant way.

On the other hand, the three-factor constitutional analytical framework has the opposite mandate, for it imposes restrictions against intrusion upon fundamental and overriding civil liberties. The examiner acknowledged, as to the first factor, that the sincere religious beliefs of Owens were burdened by the Act, but with respect to the second and third factors, he did no more than make the uncritical declaration that the burden was justified by a compelling state interest, without less restrictive alternatives of interpretation or enforcement.

The statutory and constitutional facts are not in all respects neatly separated, and they tend to coalesce. The greater the magnitude of the individual's liberty interest, the more compelling must be the state's interest sufficient to override the individual's. Similarly, the greater the individual's interest, the greater must be the state's search for less restrictive alternatives of interpretation and enforcement. Among such alternatives, constitutionally-offensive provisions of a statute may effectively be read out of the statute to save the statute or, conversely, safeguarding provisions may be read into the statute to salvage it. As we declared in *State on Behalf of Forslund v. Bronson*, 305 N.W.2d 748, 751 (Minn.1981):

> It is well established that if a statute is ambiguous, the construction which avoids constitutional conflict is preferred

---

**21.** Minn. Const. art. 1, § 3, provides:
The liberty of the press shall forever remain inviolate, and all persons may freely speak, write and publish their sentiments on all subjects, being responsible for the abuse of such right.
Minn. Const. art. 1, § 16, provides:
The enumeration of rights in this constitution shall not deny or impair others retained by and inherent in the people. The right of every man to worship God according to the dictates of his own conscience shall never be infringed; nor shall any man be compelled to attend, erect or support any place of worship, or to maintain any religious or ecclesiastical ministry, against his consent; nor shall any control of or interference with the rights of conscience be permitted, or any preference be given by law to any religious establishment or mode of worship; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness or justify practices inconsistent with the peace or safety of the state, nor shall any money be drawn from the treasury for the benefit of any religious societies or religious or theological seminaries.

although such construction may be less natural. If the act is reasonably susceptible of two different constructions, one of which would render it constitutional and the other unconstitutional, we must adopt the one making it constitutional. Additionally, in the interpretation of statutes, the courts are required to discover and effectuate legislative intent, to consider objects which the legislature seeks to accomplish by the statute and the mischief sought to be remedied, and to avoid the result which would be absurd or would do violence to the language of the statute.

(Citations omitted.)

A pervasive issue, significant in both a statutory and constitutional sense, is both illustrative of this coalescence and important to all the employment-related complaints of discrimination: Are the statutory prohibitions uncompromisingly absolute and are the stated exceptions, particularly the general prefatory exception for "a bona fide occupational qualification," just as uncompromisingly narrow? There are other general and specific exceptions that give negative answers to these really rhetorical questions:

(a) A rule of reason is incorporated in section 363.03, subd. 1(2)(a), which prohibits a system of employment which "unreasonably" excludes a person seeking employment.

(b) An exception is made by section 363.03, subds. 3 and 4, which require physical accommodations for disabled employees, if, because of size or type of operation of the employer's business or the cost of compliance, the employer would suffer a hardship.

(c) An exemption from the provisions with regard to age is made by section 363.02, subd. 7, for persons in the summer youth employment program.

(d) An exception is made by section 363.02, subd. 1(2), for a "religious *or* fraternal corporation, association, or society with respect to qualifications based on religion, when religion shall be a bona fide occupational qualification for employment."

(Emphasis supplied.)

The examiner missed the opportunity to apply his sacred-secular dichotomy to the exception for religious and fraternal corporations, neither of which is defined in the Act. Consulting *Webster's Dictionary,* he narrowly defined "religious corporations, associations or societies" as only those "whose primary purpose is ecclesiastical, which is defined as 'of or relating to a church, especially as a formal and established institution' or 'of or relating to the formal and established institutions or government of any religion.' " [22] Based on this definition, the examiner dismissed Owens' claim for an exception, stating that the fact that Owens operates the club in a manner based on his religious convictions is incidental to the primary purpose of the business.

The examiner's stated reason for rejecting Owens' claim for a religious corporation exception encounters substantial problems of inconsistency when applied to the statutory exception for fraternal corporations, associations, or societies, some of which are church related and others of which are not. Fraternal beneficiary associations are organized under Minn.Stat. ch. 64A (1984). Section 64A.02 defines such associations as:

Any corporation, society, order, or voluntary association without capital stock, organized and carried on solely for the mutual benefit of its members and their beneficiaries, and not for profit, having a representative form of government, and having a lodge system with ritualistic form of work or a branch system that

---

**22.** Minnesota Statutes ch. 315 governs the organization of religious corporations. Both the YMCA and the YWCA are, by sections 315.44 and 315.49 (1984), incorporated under this chapter. They do not, however, meet the examiner's definition of a religious corporation, association, or society—but each does, in substantial part, fit his label of "exercise emporium." This indicates, in any event, an expansion of the exception noted in the preceding paragraph of the text.

confines its membership to any one religious denomination, and which shall provide for payment of benefits in accordance with this chapter.

But section 64A.03 provides that a ritualistic form of work or ceremony is not required where membership is confined to members of any one religious denomination. The exceptions stated in section 363.02, subd. 1, however, are not confined to the limitations of section 64A.02. A common function of fraternal benefit associations is the providing of life, accident, sickness, and disability insurance for their members (section 64A.48), but they may transform themselves into mutual life insurance companies as well (section 64A.15). They are highly regulated by the insurance commissioner with respect to policy provisions, reserve funds, and other financial matters (sections 64A.19–.43). Section 64A.44 exempts these associations from taxation under the general tax or revenue laws, except as to real estate. Some fraternal benefit associations are religion-related, such as the Catholic Aid Association and Lutheran Brotherhood; others are not, such as the Sons of Norway, the Degree of Honor Protective Association, and the Woodmen of the World Insurance Society.[23]

The important point concerning the fraternal benefit associations is that they operate in the secular marketplace in competition with other insurance companies, differing only as to the character of the population from which they solicit business. It is true that they are exempt from taxation as charitable institutions, but it is equally true that not all charitable institutions are exempt from the provisions of the Human Rights Act, such as nonprofit charitable hospitals. It is true that some of the fraternal benefit associations provide financial support to churches, church-affiliated schools, and other religious institutions. It is equally true, of course, that many successful businessmen with strong religious commitment, such as Owens, give substantial support to such institutions; indeed, Owens founded and supports Chapel Hill Academy in Deephaven, Minnesota, a strongly religion-oriented elementary-secondary school.

Our legislature has, in other legislation, demonstrated sensitivity to the conflict between freedom of religion and the operation of secular statutes where the potential for conflict was readily predictable, as in the case of Sunday closing laws. Unlike such statutes in other states, of which Pennsylvania was one (see *Braunfeld v. Brown*, 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961)), the Minnesota statute, Minn.Stat. § 325.913(5) (1967), permitted Sunday opening for "a place of business which is regularly closed on Saturday and which was actually closed all hours on the Saturday before the Sunday on which such sale of restricted items occurs." This exception, notwithstanding the state's burden of enforcement, was designed to avoid a burden upon those whose faith, like those of the Orthodox Jewish faith, requires the closing of their places of business and total abstention from all manner of work from nightfall each Friday until nightfall each Saturday. Taking note of this in *State v. Target Stores, Inc.*, 279 Minn. 447, 459, 156 N.W.2d 908, 916–17 (1968) (although invalidating the statute on grounds of vagueness, as a denial of due process under the United States and Minnesota Constitutions), we said:

> The statute in this case reflects a legislative attempt to alleviate the indirect religious burden upon Sabbatarians by granting those merchants a restriction-free Sunday if they close on Saturday, while at the same time requiring no religious declaration for the exercise of that right.

Our legislature, unlike the examiner, obviously did not think that religious freedom was irrelevant merely because its exercise related only to secular commercial activities. Neither was the legislature saying,

---

**23.** The information stated in this paragraph, other than references to Minn.Stat. ch. 64A, is taken from a brochure entitled *The Story of Fraternal Benefit Societies in America,* obtained from the Minnesota Insurance Information Center. No information is available as to how circumspect these competitive fraternal benefit associations are in limiting sales of insurance only to persons genuinely qualified by religious or other membership criteria.

as does the majority opinion, that such an exception would "frustrate" the statutory objectives.

It would do no violence to the statute either to impose upon Owens a less restrictive definition of "religious corporation" or simply to extend to his business-discipleship the comparable exception granted by the statute to fraternal corporations, associations, and societies.[24] To do so would not, contrary to the majority opinion, "emasculate" the statute, and it is consistent with the legislature's own action in providing several exceptions to application of the statute. Not to do so, on the other hand, raises grave issues of freedom of religion and speech and, to some extent, the denial of equal protection and due process under the Minnesota Constitution. The exceptions for which I argue would be dispositive of the principal issues raised by the complaints against Owens.

## III.

### Analysis of Hearing Examiner's Findings of Fact, Conclusions of Law, and Enforcement Orders

The findings of fact and conclusions of law, together with cease and desist orders based thereon,[25] on the nine complaints de-

24. The religion-based exception for churches, of course, makes sense. A Jewish synagogue or temple should not be required to employ a Christian or other person who inherently would be indifferent, even if not "antagonistic," to its beliefs and practices. The Catholic Bulletin of the Archdiocese of St. Paul-Minneapolis obviously would not choose to employ a Lutheran as its editor. Trinity Covenant Church should not be required to employ a Unitarian. The incompatible religious identification would be ascertained by direct inquiry. Unlike these religious corporations, and unlike some fraternal benefit associations, Owens notably does not limit employment to persons of any one religious affiliation.

25. The examiner deferred to later hearing a determination of statutory money damages to be paid to the charging parties. He did issue a cease and desist order in the following terms, prohibiting:
(a) refusal to hire any person because of that person's religious beliefs or practices;
(b) refusal to hire any person because that person has stated an objection to the religious beliefs or practices of the Respondents' management or other employees;
(c) inquiry into the religious beliefs or practices of any prospective employee;
(d) inquiry into the religious beliefs or practices of any employee;
(e) taking any adverse action against any employee because of that employee's religious beliefs or practices;
(f) denial of a supervisory or management position to any person based upon that person's religious beliefs or practices;
(g) requiring, soliciting or suggesting the participation in Bible studies or other religious exercises or practices on the part of any employee;
(h) taking adverse action against any employee who does not participate in Bible studies or any other religious exercises or practices because of that non-participation;
(i) taking any adverse action against any employee who objects to the religious practices or exercise of management or of any other employees because of their objection(s) thereto; and
(2) Discriminating against any person on the basis of marital status, including:
(a) refusal to hire any person because of marital status;
(b) requiring any prospective employee to furnish information pertaining to marital status;
(c) taking adverse action against any employee because of marital status;
(d) denial of a supervisory or management position to any person based upon that person's marital status; and
(3) Discriminating against any person on the basis of sex, including:
(a) refusal to hire any young, unmarried women who live away from home without their parents' consent because of that lack of consent;
(b) inquiry of any young, unmarried woman as to whether she lives away from home and, if she does, whether she has her parents' consent;
(c) refusal to hire any young, unmarried woman who desires to work and does not have the consent of her parents, because of that lack of consent;
(d) inquiry of any young, unmarried woman as to whether she has her parents' consent to work;
(e) refusal to hire any married woman who desires to work and does not have her husband's consent, because of lack of consent;
(f) inquiry of any married woman as to whether she has her husband's consent to work; and
(4) Denial to any person of the full and equal enjoyment of its services, facilities and privileges as a public accommodation, to wit:
(a) harassment or ridicule of any member, guest or other use of its services and facilities because of religion.

termined adversely to Owens and his associates, Crevier and Larson, may be grouped for discussion into five categories. The fourth and fifth of these categories present issues not directly considered in the prior parts of this opinion, and all of them consider issues of freedom of speech, in addition to the main theme of free exercise of religion. The text of the opinion can only highlight the examiner's findings. The factual findings of the examiner are set forth verbatim in separate footnotes as to each of the charging parties, but omitting for brevity findings as to dates of prior employment and experience found to qualify them for the positions involved, which are without significance to the issues con-

sidered in this opinion. The accuracy of the more general recital of facts in the majority opinion should be tested by comparison to the specific footnoted findings. These findings, moreover, will make even more self-evident the unwarranted sweep of the cease and desist orders.

1. Finding: requiring the furnishing of information related to religion or marital status.

The finding and conclusion as to Joseph Williams [26] is limited *solely* to this; and a reading of the finding in the footnote reveals its lack of substance. The findings and conclusions as to Robin Ann Carnahan [27] and Beverly Larsen,[28] however, do

**26.** *Joseph Williams,* a champion body builder who worked out at the LaSalle club, approached Crevier about the possibility of employment. Although there was no current opening for an associate membership director, Crevier did discuss with Williams what was involved in the job and that the job description was based on biblical principles. He explained to Williams what the religious beliefs of the Sports and Health Club's management were, specifically including that Williams had to be a reborn Christian in order to be hired and also would have to go to weekly Bible studies. Williams then decided not to fill out an application for employment, although Crevier offered him the opportunity to do so for consideration when an opening occurred in the future.

The examiner found that appellants had violated Minn.Stat. § 363.03, subd. 1(4)(a), by requiring Williams to furnish information pertaining to religion before being employed.

**27.** *Robin Ann Carnahan* was employed as an associate membership director at the Normandale club. Prior to being hired by appellants she had two employment interviews, one with Vice President Larson and Vice President Crevier, and the other with Arthur Owens. The first interview consisted of questions regarding experience and background in physical fitness and instruction and as to her attitude toward selling. The interview with Owens related to her religion, her marriage, and her family, namely, whether she was a Christian; if she read the Bible; if she went to church; if she would speak freely about her religion to other people; whether she was married; whether she and her husband prayed together and went to church together; and whether her parents, who were divorced, were still married. Owens perceived a possible antagonistic attitude by her demeanor and reluctance to speak freely during the interview, particularly when she answered questions about her parents and their divorce. Sub-

sequent to her employment, during a series of conferences with associate membership directors at the club to discuss their goals in the organization and their general attitudes, Crevier asked for her opinion of Owens. She expressed her disapproval of religious-oriented employment interviews and of the sale of Bibles in the club's lobby. She also compared the unavailability of health-oriented literature at the club with the great volume of Christian material available for members in the lobby and lounges. Referring to the requirement that all management employees were required to attend Bible studies as part of regular managers' meetings, she asked Crevier if it would be possible for a manager or assistant manager to attend only the business portion of such meetings. Crevier told her that if that was her attitude, he would have to dismiss her. Carnahan was told that it was a requirement that employees in management positions had to go to Bible studies.

The examiner concluded, as a matter of law, that appellants had violated Minn.Stat. § 363.03, subd. 1(2)(b), by discharging Carnahan because of religion and also had violated subd. 1(2)(c) by discriminating against Carnahan because of religion with respect to the upgrading of her employment.

**28.** *Beverly Larsen* was employed at the Normandale club as an associate membership director. Larsen's original interview with Owens focused on personal matters dealing with her religion, her marriage, and her parents, who were divorced. She too was asked whether she and her husband went to church and whether they prayed together. She was also asked to answer many questions regarding the breakup of her parents' marriage. She was then hired. During a subsequent interview, when Vice President Larson asked whether she was interested in a management position, she said that she was but volunteered that she did not think she was prob-

involve extensive religion-related interrogation concerning Bible reading, prayer practice, and church attendance, together with questions about the divorces of their parents. These findings are then joined with other findings of discrimination in employment opportunity.

Forbidding an employer from asking questions related to religion or morality denies to that employer a right to important information relevant to suitability for employment. In a recent survey, 100 vice presidents and personnel directors of "Fortune 1,000" companies, as reported in the *Freeway News,* Feb. 13, 1985, were asked: "What employee behavior disturbs you the most?" Their reported answers:

By far, dishonesty and lying topped the list of the most objectionable behavior. If a company believes an employee lacks integrity, all of his or her positive qualities—ranging from skill and experience to productivity and intelligence—become meaningless.

Next on the unpopularity hit parade came irresponsibility, goofing off and attending to personal business on company time.

\* \* \* \* \* \*

Employees who demonstrate an absence of commitment, concern, or dedication were often cited as employees not deserving of raises and promotions.

A professionalism survey report by the Minnesota Bar Association, reported in the March 1985 issue of *The Bench & Bar of Minnesota,* confirms this fundamental qualification:

**Honesty and Integrity:**

These are the bywords of professionalism in Minnesota as indicated by the 1,748 professionalism surveys returned this past December. For those who decry the lack of ethics and moral fiber in today's society, this is a resounding affirmation that persons with such attributes are indeed recognized. For the rest of us, such responses provide a heartwarming experience which reaffirms our inner convictions.

Without suggesting that nonreligious persons inevitably lack qualities of honesty or commitment to duty, there is a substantial degree of assurance that those of genuine religious commitment will have those qualities. It can hardly be doubted, furthermore, that those who are "antagonistic to the gospel," that is, antagonistic to Owens' manner of conducting his business, demonstrate "an absence of commitment, concern or dedication" to the interests of this employer valued by the surveyed personnel directors.

These limitations upon employee interviews are impermissible limitations upon freedom of speech, unless the state has a compelling interest which overrides that individual freedom. But it is only a discriminatory employment decision of the employer, not the inquiry itself, that should invoke the state's concern. The fact of the inquiry may prove the inquirer's knowledge of a person's religion or marital status and tie an inference from that knowledge to an otherwise unexplained adverse decision, but the examiner made no such linkage in these three cases. The most obvious example is that of Joseph Williams, for the complaint was limited to the inquiry only. The inquiries of Carnahan and Larsen concerning their parents' divorces were not linked to any violation based on their own marital status, nor could they have been.

A closer, yet questionable, linkage is that relating to Katherine Lamannsky, *infra* note 36. Even here, however, the information concerning her divorce did not surface

ably "Christian" enough for Owens. She said that she would be happy to work in management if Owens did not pressure and push her into being his kind of Christian, referring particularly to the Bible studies and prayer that were part of the mandatory managers meetings. The next day, Crevier dismissed her, giving as a reason that she had a "negative attitude" about

the club, meaning that she had a "spiritual problem."

The examiner concluded that appellants had violated Minn.Stat. § 363.03, subd. 1(2)(b) by discharging Larsen because of religion and also had violated subd. 1(2)(c) by discriminating against Larsen because of religion with respect to the upgrading of her employment.

in response to an inquiry by the employer. Where the record establishes, as here, that the employer does employ divorced persons, the finding that Lamannsky's "status as a divorcee was what cost her the job" is most questionable. The cases of Carnahan, Larsen, and Lamannsky are the same to the extent that they prompted a gratuitous lecture by Owens and Crevier on marriage and divorce and the disparate responsibilities of husbands and wives in preserving troubled marriages. It was the unresponsiveness of Lamannsky to this attempted dialogue, not the fact of the divorce, that precipitated her rejection. The point is that a *lecture*, however anachronistic,[29] is not itself a violation of the statute.

There is remarkable vagueness in the examiner's assessment of questions to Carnahan and Larsen about reading the Bible, prayer, and church attendance. None of them identify a particular religion, although they concededly may distinguish the religious from the nonreligious. If, however, it is impermissible to ask whether a person reads the Bible, which is itself a library of books, would it be impermissible to inquire whether a person has read such other classics as John Bunyan's *Pilgrim's Progress* or John Milton's *Paradise Lost* or *Paradise Regained?* Or would a conversation about the *Faith & Ferment* book be impermissible in an employment context?

The preoccupation of the examiner with Bible studies on company premises has been considered in the forepart of this opinion as an issue of religious freedom. It arises again as an issue of freedom of speech from the order of the examiner prohibiting "soliciting or suggesting participation in Bible studies." This is so patently unconstitutional as to require no other comments beyond identifying it.

2. Finding: dismissing Carnahan,[30] Larsen,[31] and Robert Severin [32] from their employment on religion-based grounds.

The right of this employer to establish the work environment, including mandatory Bible study for managerial employees and voluntary sessions for other employees, has been extensively discussed in Part II. The interrogation of Carnahan and, to

---

**29.** The Scriptural passages upon which Crevier relied for his gratuitous lecture placing the onus for divorce upon the wife apparently included 1 *Peter* 3:1, *Colossians* 3:18, and *Ephesians* 5:22–24, in which St. Peter and St. Paul enjoined wives to be "submissive" and "obedient" to their husbands. The same writers, however, enjoined husbands to "respect" and "love" their wives. 1 *Peter* 3:7, *Colossians* 3:19, and *Ephesians* 5:33. (The reciprocity of obligations in the familial relationship is further reflected in *Colossians* 3:20–21 and *Ephesians* 6:1–4, in which children are charged with a duty to "obey" parents, but parents are told not to "irritate" or "anger" their children.) But over-arching all these surely is 1 *Corinthians* 13:1–13, the love chapter read at countless wedding ceremonies.

If the respective duties of husbands and wives are indeed disparate and immutable, however, that would be equally true of St. Paul's declaration that "[i]t is a disgraceful thing for a woman to speak in a church meeting," 1 *Corinthians* 14:33–35, and that "slaves [are to] obey [their] human masters in all things," *Colossians* 3:22. Conversely, if the injunctions to women and slaves are acknowledged to be anachronistic, the same may be said of any epistle being read to require discrimination between spouses. "[A]lmost all of the respondents [in the *Faith & Ferment* project] (94%) accept the understanding that women and men are both created in the image of God and are therefore equal in God's sight." *Faith & Ferment* at 34.

**30.** *See supra* note 27.

**31.** *See supra* note 28.

**32.** *Robert Severin* was employed as a programmer-associate membership director at the Midway and Apache clubs. On frequent occasions throughout 1982, Severin was asked by Owens, Larson, and Crevier to attend the weekly Bible studies conducted by the manager of the Midway club. Severin is a Roman Catholic who believes that worship should be private or "in church" and kept out of the workplace. He declined to join in the Bible studies. In January 1983, Severin voiced the opinion that the club's staff and management were not as motivated or showing the same degree of enthusiasm that they had under a previous manager. Shortly after the staff meeting ended, Severin was dismissed for having a "bad attitude." Severin acknowledged on cross-examination that no one in management ever directly told him that he would lose his job if he did not attend Bible studies or told him that he lost his job because of non-attendance at them.

The examiner concluded that appellants had violated Minn.Stat. § 363.03, subd. 1(2)(b), by discharging Robert Severin because of religion.

a lesser degree, Larsen was rather extensive. But it seems clear that they were dismissed for "bad attitude" or "negative attitude" in asserting objections to this religious work environment. Severin complained that the staff were not as motivated as they had been under prior management. Dismissal of malcontent employees is not a violation of the statute.

3. Finding: refusing to promote Carnahan,[33] Larsen,[34] and Steven Bruhjell[35] to managerial positions on religion-based grounds.

This issue has been fully considered in foreparts of this opinion with respect to Owens' right to have managers who will be compatible with the basic company policy to be a "discipleship." Unique, however, is the examiner's reaching into conversations during a social engagement between Steven Bruhjell and the Owens family and an at-home conversation between Bruhjell and Vice President Larson to find a religion-related violation of the statute. Unlike Carnahan and Larsen, moreover, Bruhjell resigned and was not dismissed.

4. Finding: refusing the applications for employment of Katherine Lamannsky,[36] Marilyn Crosby,[37] and Linda Perkins[38] because of marital status.

**33.** *See supra* note 27.

**34.** *See supra* note 28.

**35.** *Steven Bruhjell* was employed as an associate membership director at the Normandale club. Shortly after he started working at Normandale, he played an after-hours racketball game with Arthur Owens and two of Owens' daughters. After the game, Bruhjell and the three Owens got into a discussion on religion, during which Owens became "strident" and "tried to advance his beliefs" on Bruhjell, beliefs with which Bruhjell openly disagreed. He also had been invited but declined to attend Bible studies. In late 1974, after Bruhjell had been passed over for a promotion, he was told by his then roommate, Vice President Larson, that he would not be promoted until he became a born-again Christian. In late 1976 Bruhjell decided to speak directly to Owens in an effort to find out if it was true that the only reason he had not been promoted to management was because of his religious beliefs. Owens admitted to him that that was the only reason. Shortly thereafter Bruhjell resigned his employment because he felt he had no future in appellants' organization.

The examiner held that appellants violated Minn.Stat. § 363.03, subd. 1(2)(c), by discriminating against Bruhjell because of religion with respect to upgrading of his employment.

**36.** *Katherine Lamannsky* was interviewed for a receptionist position by Crevier at the LaSalle club in July 1980. During the interview Crevier learned from the application that she was divorced. He began to probe about the details why Lamannsky had gotten divorced, and she refused to tell him beyond the general statement that she and her husband had grown apart. Crevier told her that the man was the head of the household and that if she had tried to work it out the marriage would have stayed together. He reinforced his point with Bible passages. Because she persisted in refusing to answer Crevier's inquiries along this line, Crevier told Lamannsky that he did not feel she would be fit to work at the club. She thanked him and left. No specific reason was given for not employing her.

The examiner found that appellants violated Minn.Stat. § 363.03, subd. 1(2)(a), by refusing to hire Lamannsky because of marital status.

**37.** *Marilyn Crosby* was interviewed for an associate membership director's position at the Apache club. Crosby was asked personal questions only, such as whether she had any problems with her father, whether she had roommates, and with whom she lived. She answered all of the questions, including telling Crevier that she was single and that she had recently begun sharing a house with her boyfriend. Crevier thereupon terminated the interview, telling Crosby that "we won't be able to hire you because you live with your boyfriend." He also told her that if she moved out she could have the job.

The examiner found that appellants violated Minn.Stat. § 363.03, subd. 1(2)(a), by refusing to hire Marilyn Crosby because of marital status.

**38.** *Linda Perkins*, along with other employees, was interviewed to see if she would be hired under Owens' new management when he bought the Minnetonka Racket and Swim Club. She had been employed as a file clerk and child-care supervisor but, although Owens did not intend to provide child-care services and had no employment then available for an office worker who could not type, Owens continued the interview to see if there was something that could be done to keep Perkins employed in some other way. He asked her whether she was a Christian and inquired about where and with whom she lived. She told him that she lived with her fiance, whereupon the interview termi-

An issue not heretofore considered relates to the refusal to employ Crosby and Perkins because they cohabited with persons of the opposite sex to whom they were not married.[39] The examiner acknowledges in his memorandum that there was in this relationship a clear inference of sexual relations between the cohabiting couples. Minnesota Statutes § 609.34 (1984) declares such relationship to be a crime:

> When a man and a single woman have sexual intercourse with each other, each is guilty of fornication, which is a misdemeanor.

Given the apparently widespread incidents of such living arrangements today, the inquiry by Owens is not surprising. Owens did not wish to, and is not required to, "subsidize" criminal behavior. The extraordinary response of the examiner to this defense is that as a matter of legislative intent, the subsequently enacted Human Rights Act "superseded" the criminal statute, a judgment that will come as a surprise to those legislators who have regularly but unsuccessfully authored bills to repeal the fornication statute. The examiner may as well have asserted the repeal of Minn.Stat. § 144.651 (1984), the Bill of Rights for Patients and Residents of Health Care Facilities, which by subdivision 28 provides:

> Residents, if *married,* shall be assured privacy for visits by their spouses and, if both spouses are residents of the facility, they shall be permitted to share a room, unless medically contraindicated and doc-

umented by their physicians in the medical records.

(Emphasis supplied.) This statute, like the fornication statute, grants marital status protection in sexual relations only to married persons.

The examiner's effort to find discrimination in this refusal of employment demonstrates again his unreasonable interpretation and application of the Human Rights Act, for his determination that the criminal statute was superseded by a civil statute is plainly wrong. As we held in *Target Stores, Inc.,* 279 Minn. at 473–74, 156 N.W.2d at 925, "[t]he principle of implied statutory repeal is not favored"; rather, as stated in *State v. Sobelman,* 199 Minn. 232, 236, 271 N.W. 484, 486 (1937):

> Before it can be said that a later act is intended to be a substitute for the earlier, "there must be unmistakable intent manifested on the part of the legislature to make the new act a substitute for the old and to contain all the law on the subject; for mere similarity in the provisions of the two statutes is not enough to effect a repeal, even though the similarity may be such to cause confusion or inconvenience."

It is preposterous to impose sanctions upon an employer, particularly this employer, who refused to employ persons whose conduct constitutes criminal misbehavior.

5. Finding: denying Miriam Cameron [40] full and equal enjoyment of public accommodations because of religion.

---

nated forthwith, and Owens said to her: "You realize that it is sinful, and it is sinful to God, living out of wedlock * * * and since it is sinful to God, it is sinful to me."

The examiner found that appellants violated Minn.Stat. § 363.03, subd. 1(2)(a), by refusing to hire Linda Perkins because of marital status.

**39.** The finding does not relate to sex discrimination, but the cease and desist order refers to discrimination on the basis of both sex and marital status. "Sex" obviously refers to gender and not sexual activity.

The plain purpose of the statute is to preclude an employer from having a policy not to employ single persons *or* divorced persons *or* married persons. It is at the least a curiosity that in his

several findings the examiner did not find discrimination against persons in one or the other status but against all three, a strange application of the statute.

**40.** *Miriam Cameron* had joined the LaSalle Sports and Health Club in 1978. Cameron, a Jew, had noticed no religious emphasis at the club during the first 18 months of her membership, but in mid-1980, she began to notice an increase in the proliferation of fundamentalist Christian literature. The specific charge involves a conversation that occurred in August 1980 following the publication of a book by Cameron entitled *Hello, I'm God and I'm Here to Help You.* Cameron and Vice President Crevier met in a club office. He belittled Cameron's

The issue presented by this finding does not involve discrimination in matters of employment and has not been heretofore considered in this opinion. It is yet another example of an ambitiously expansive administrative application of the Human Rights Act, this time involving discrimination in public accommodations—a provision which, by its terms, is both civil and criminal. *See* Minn.Stat. § 363.101 (1984), *supra* note 20.

Cameron, a club member and not an employee, as the examiner found, initiated a conversation in the office of Crevier about a book that she had written, the contents of which were contrary to Crevier's religious beliefs. There ensued a vigorous and "strident" disputation on religious grounds which disturbed, "overwhelmed," and "totally demoralized" her. "The problem," the examiner said, "is not with what [Crevier] said, but with how he said it." The examiner held that it was "treatment so at variance with what would reasonably be anticipated absent discrimination * * * that discrimination is the probable explanation for [Crevier's] conduct." Just as she came to Crevier's office on her own initiative, Cameron was not a captive but free to end the discussion by simply departing. It might well be that Crevier's role was not winsome, but it is utterly absurd to hold that it was a discriminatory denial of the right to services of the club and to order a refund of Cameron's initial membership fee. It is noteworthy, moreover, that Cameron remained as a club member for 4 or 5 months following this episode, which would seem to indicate that the event was not as troublesome as she asserted.

To hold, as here, that a vigorous and robust debate on a religious subject, however controversial, may by statute or administrative order be prohibited or made subject to a monetary penalty is a most flagrant denial of freedom of speech.

IV.

### The Minnesota Constitution as Exclusive Basis of Decision

The constitutional issues raised in this case focus on the Minnesota Constitution as the adequate and independent basis for decision, to the exclusion of the United States Constitution. A current exposition of this emerging constitutional practice by Minnesota lawyers Terrence Fleming and Jack Nordby in 7 Hamline L.Rev. 51 (1984), *The Minnesota Bill of Rights: Wrapt in the Old Miasmal Mist,* clarifies the power of state courts to interpret and apply their own constitutional Bill of Rights and the specific criteria that should govern the decision whether the state's Bill of Rights mandates departure from the minimum standards of the federal constitution.[41] Among several other law review commentaries, *see also* Pollock, *State Constitutions as Separate Sources of Fundamental Rights,* 35 Rutgers L.Rev. 707 (1983), and Linde, *E. Pluribus,* 18 Ga.L.Rev. 165 (1984).

It is axiomatic that a state may interpret its state constitution to offer other and more—but not less—protection of individual rights than does the federal constitution. *Pruneyard Shopping Center v. Robins,* 447 U.S. 74, 81, 100 S.Ct. 2035, 2040, 64 L.Ed.2d 741 (1980); *Oregon v. Hass,* 420 U.S. 714, 719, 95 S.Ct. 1215, 1219, 43 L.Ed.2d 570 (1975). State courts are, and should be, the first line of defense for individual liberties within the federalist system. The Minnesota Bill of Rights, indeed, antedated the adoption of the fourteenth amendment, by which the federal

views and lectured her on fundamentalist Christian doctrine. Crevier talked in a loud voice, leaned across the table, and had a stern expression on his face; Cameron was visibly shaken. Thereafter, both Cameron and her husband decided to terminate their membership and asked for a refund, which was denied.

The examiner found that appellants had denied Cameron the full and equal enjoyment of its services and facilities as a place of public accommodation because of religion, within the meaning of Minn.Stat. § 363.03, subd. 3.

**41.** The authors are practitioners of criminal law and write from that perspective, but the basic principles are, of course, the same with respect to issues of free speech and free exercise of religion.

Bill of Rights was in large measure made applicable to the states. The result is that the citizen has two sources for the protection of his or her civil liberties. This state should not abdicate its responsibility to effectuate both lines of constitutional defense.

This does not mean, however, that the state should in all circumstances construe its own constitution more expansively than the federal constitution, particularly where their comparable provisions are textually identical, for the decisions of the United States Supreme Court inherently are of persuasive, although not dispositive, force. As Justice Hans Linde, in *State v. Kennedy*, 295 Or. 260, 666 P.2d 1316 (1983), urging that as a matter of judicial economy a state court should always consult dispositive state grounds for decision, without needless resort to federal grounds for decision, responded to a non sequitur contention that the United States Supreme Court's decisions under substantially identical texts "not only deserve respect but presumptively fix its correct meaning also in state constitutions":

> The state finds some difficulty in explaining why this should be so. If state guarantees are presumptively bound to interpretation of the federal Bill of Rights merely because they are federal, the argument extends similar force to lower federal court decisions when the Supreme Court has not spoken. If the argument is only that the federal guarantees are older than the Oregon Constitution, the fact, of course, is that they were adopted in order to bind the federal government to guarantees already established in the existing states.

*Id.* at 270, 666 P.2d at 1322.

A strong basis for an independent interpretation, however, may be presented where invocation of the Minnesota Bill of Rights, as in this case, concerns conditions unique to this state. As Fleming and Nordby suggest:

> Innovative examination of this factor provides cogent arguments for engaging in independent interpretation as well as significant direction for decision-making. Several questions should be considered in examining this factor: whether Minnesota's history and traditions are relevant to the controversy; whether the controversy is local in nature; whether the resolution of the controversy rests primarily in a determination of localized facts; whether the Minnesota Supreme Court is in a better position than the federal courts to make the adjudication because of its superior knowledge of, experience with, and proximity to the controversy; whether the controversy warrants an individualized, experimental resolution of state-wide applicability or necessitates a broad, uniform resolution of nation-wide applicability; and whether there are other circumstances unique to Minnesota which mandate a decision contrary to the existing federal doctrine.[42]

7 Hamline L.Rev. at 76 (footnotes omitted).

The basis for a different and more expansive interpretation is stronger yet where the provisions on the same subject are textually different. Unlike article 1, section 16, *supra* note 21, the first amendment to the Constitution of the United States more cryptically provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of people peaceably to assemble, and to petition the Government for a redress of grievances.

Fleming and Nordby aptly observe concerning this difference:

> [T]he state Bill of Rights expressly grants affirmative rights in the areas of free press, free speech and religious worship while the corresponding federal provision simply attempts to restrain gov-

---

**42.** The Minnesota religious milieu, expressed in the language of its constitution, *supra* note 21, and contemporaneously reflected in the *Faith & Ferment* project report, *supra* notes 18 and 19, relates to Minnesota's history and religious and sociological traditions. The controversy, moreover, involves a business lacking interstate commerce characteristics and is therefore basically local in nature.

ernmental action. In effect, the language of the state constitution appears to afford Minnesota citizens greater protection than does the Federal Constitution. It also serves to lessen the force of United States Supreme Court decisions which only refer to the more limited protection afforded by the Federal Bill of Rights.

7 Hamline L.Rev. at 67–68 (footnotes omitted).

Chief Justice Samuel J. Roberts of the Pennsylvania Supreme Court, now retired, in a speech delivered a year ago before members of the Wyoming bar and representatives of the University of Wyoming College of Law (reprinted in 17 IJA Report of the Institute of Judicial Administration No. 2 (Winter 1985)) declared state court reliance on the adequate and independent state grounds for decision "the most significant development in federal-state relations over the last decade"; it reduces the burden of our federal court system, but even more importantly, lends *stability, integrity, and finality* to state court decisions and thus makes for a better court system—a system governed, controlled, and supervised by state court adjudications, for state judges, practitioners, and litigants." (Emphasis in original.) Discussing several cases in which state courts had undertaken to rely exclusively on their own constitutions but which had been nonetheless reviewed by the United States Supreme Court, Justice Roberts points out that "where a state court intends to rest a decision on state law, the state court in its opinion must clearly and specifically articulate that its decision is based exclusively on state law *and must disclaim even the citation to analogous federal cases.*" (Emphasis added.) For that reason, this dissenting opinion neither cites federal cases on freedom of speech and religion nor responds to those cited in the majority opinion.

## V.

### *Conclusion*

Mindless antipathy of one person toward another of different race, religion, gender, or marital status is repugnant to anyone who claims to be civilized. History is replete with evidence of its destructive effect on the lives of people occupying the close quarters of this planet. Simply in economic terms, the denial of the opportunity to employ or be employed solely because of such antipathies bears a high cost to both individuals and the state itself.

The objectives of the Human Rights Act are, therefore, salutary. Legislation, however, as demonstrated in this case, can be repressive if not administered with reason and consistent with constitutionally-guaranteed civil liberties.

The numerosity and nature of the state's complaints against Owens obscures an important and undisputed fact of which the majority opinion takes note: Owens' business employs persons of different races and religions—Catholics, Jews, and Protestants of various denominations—or no religion, men and women, and single, married, and divorced persons. The acts of alleged discrimination, moreover, were not motivated by Owens' hatred of a person of religion or status different from his own; indeed, by his own religious convictions he is constrained by the great commandment to love his neighbor.

The posture in which these complaints against Owens were adjudicated is one for which the Human Rights Act was not intended. The examiner himself took some note of this:

This case is somewhat unique, in that the alleged discrimination is not against individuals who practice a religion, but against those who either refuse to practice or are offended by the promotion of a religion. This is the opposite of a law suit where the charges are discrimination against a race, or a religious group, or preference to one sex over another.

There is, regrettably, in this case a latent spirit of indifference, if not hostility, to deeply-held religious beliefs, contrary to what I believe is the spirit of the people of Minnesota.

I dissent, with respect, from the decision of the majority which affirms the. decision of the hearing examiner, for I would in all respects reverse and put an end to this unfortunate litigation.

YETKA, Justice (dissenting).

Prior to receiving the dissent of Justice Peterson, I had written a special concurring opinion reluctantly accepting the majority decision, but expressing strong reservations. After reading Justice Peterson's scholarly and eloquent dissent, however, I join him in dissenting.

There is some controversy on how much significance could be attached to questions by defendants of female employees as to their marital status and whether they have their husbands' or fathers' consents to seek employment. I wish to make it clear that I do not believe it proper under any circumstances for an employer to ask for such consent. Women's rights are too far advanced to turn the clock back to the 19th century. In my opinion, they are entitled to equal protection in seeking employment under both the federal and state constitutions whether an ERA amendment is adopted or not. Such a line of questioning is totally improper under the statute and the constitutions.

However, while employers have certain responsibilities under this statute, it does not totally abrogate their rights to obtain background information on prospective employees. The majority opinion states that, "[w]hile we recognize that in order to make informed and intelligent employment decisions, employers must be permitted some leeway to question an employee or applicant about his or her background, upbringing and perspective." I'm not sure, however, that that is sufficient guidance or reassurance to employers. I am fearful that the opinion will be too broadly interpreted. While individual preferences might differ as to what characteristics should exist for a good employee, certain qualifications appear to be recognized universally as desirable; for example, is the prospective employee in good physical and mental health; is he/she likely to be honest and a conscientious worker; can he/she get along with fellow employees; is he/she likely to get to work on time; be free of frequent absences and perform his/her job cheerfully, efficiently and diligently? The fact is that there is a high correlation between being a good practicing Christian and fulfilling each of the foregoing qualifications.

If an affluent employer wants to spend the money to do so, he can easily, quietly have an investigation made of all prospective applicants and learn all he wants to know about that person or persons. A small or marginal employer, on the other hand, may not be able to afford such an investigation. Yet, the consequences of hiring an employee are, undoubtedly, more dire and harmful to the small employer than the large. Therefore, the act that claims as its purpose the prevention of certain discriminations may, in fact, result in quite another discrimination against certain employers.

Here is an act which has as its stated purpose the elimination of discrimination in employment. It has been rightly invoked to protect minorities—in color, gender, and religion. Yet, it would discriminate against the majority religion in the United States since the nation's founding, namely, Christianity. This decision would deny a Christian the right to practice his belief in the marketplace. It would deny an employer the right to basic information about a prospective employee that affects not only the well-being of the employer and his business, but also that of the prospective employee's fellow employees. I find the findings so repugnant that it reaches the stage of being ridiculous. True, the majority opinion points out that opinions of the United States federal courts would suggest that you may have a decision upholding one person's constitutional rights that effectively deny another person his or her rights. That may be so, but where an act can be interpreted to prevent such a delicate balancing act, why shouldn't it be so read?

As one of the original authors of fair employment practices legislation in the

Minnesota Legislature in the 1950's when such proposed legislation was extremely unpopular, I firmly believe that an employer should not be allowed to discriminate on the basis of race, color, gender or creed. I also believe just as firmly that an employer cannot be denied his constitutional rights to information essential to making a meaningful selection of a new employee. We are at that stage in the evolution of American constitutional history where we are either going to be one nation indivisible with equal rights for all or we are going to become a nation with groups of citizens within that are virtually separate nations of themselves. The time has come to strike down all discrimination, all special privileges and treat all of our citizens equally before the law.

I, therefore, join Justice Peterson in finding that, under the Minnesota Constitution, defendants' constitutional rights are violated by the Minnesota Human Rights Act. The proper disposition of this case perhaps should be to remand to the hearing examiner; however, I agree with Justice Peterson that the case has punished defendants far beyond whatever actions were taken on their part. There comes a point where enough is enough, and the case ought to be terminated here. I, therefore, would reverse.