STATE of Minnesota, by Linda C. JOHNSON, Commissioner, Department of Human Rights, petitioner, Respondent,

v.

**SPORTS & HEALTH CLUB, INC., d.b.a. LaSalle Sports & Health Club, et al., Appellants.**

No. C9–86–351.

Court of Appeals of Minnesota.

Aug. 19, 1986.

Review Denied Sept. 24, 1986.

See also, 368 N.W.2d 747.

Hubert H. Humphrey, III, Atty. Gen., Elizabeth V. Cutter, Sp. Asst. Atty. Gen., St. Paul, for respondent.

Steve D. Jamar, Clyde F. Anderson, Meagher, Geer, Markham, Anderson, Adamson, Flaskamp & Brennan, Minneapolis, for appellants.

Heard, considered, and decided by FOLEY, P.J., and HUSPENI and CRIPPEN, JJ.

## OPINION

HUSPENI, Judge.

Appellants, Sports and Health Club, Inc., Arthur Owens, Marc Crevier and Forest Larson, were ordered by the trial court to cease and desist their discriminatory employment practices. When they failed to do so the trial court found them in contempt and ordered them to pay a fine of $300 per day effective February 24, 1986, until they were in compliance. On appeal they argue that the injunction unconstitutionally deprives them of freedom of speech, religion, association and the press; that they cannot be held in contempt for violating an unlawful order; that it is impossible for them to comply with the trial court's orders; that there is insufficient evidence to show they have violated the trial court's order; that the orders do not provide clear notice of what conduct is prohibited; that the State is not a proper party for a contempt remedy; and that the $300 a day fine violates the contempt statute. We affirm.

## FACTS

This case is not new to the courts. The facts underlying the current action are set forth in detail in *State by McClure v. Sports & Health Club, Inc.*, 370 N.W.2d 844 (Minn.1985), appeal dismissed, —— U.S. ——, 106 S.Ct. 3315, 91 L.Ed.2d —— (1986).

Arthur Owens, Marc Crevier and Forest Larson are the owners of Sports and Health Club, Inc. All three men hold fundamentalist religious convictions and they believe they must act in accordance with these beliefs in both their personal and business lives. The Minnesota Supreme Court noted that "these convictions are deeply held, supported in Biblical scripture, and sincere." *Sports & Health Club*, 370 N.W.2d at 846. Appellants instituted several employment practices at the Sports and Health Clubs to promote these beliefs. These practices included permitting only born-again Christians to hold management positions; questioning prospective employees about their religious beliefs and practices, their marital status and their sexual relations; requiring managers to attend weekly Bible studies, and suggesting that other personnel also attend.

On April 26, 1984, an Administrative Law Judge issued an order that enjoined appellants from, among other things:

(1) Discriminating against any person on the basis of religion, including:

    (a) refusal to hire any person because of that person's religious beliefs or practices;

    (b) refusal to hire any person because that person has stated an objection to the religious beliefs or practices of the Respondents' management or other employees;

    (c) inquiry into the religious beliefs or practices of any prospective employee;

    (d) inquiry into the religious beliefs or practices of any employee;

    (e) taking any adverse action against any employee because of that employee's religious beliefs or practices;

(f) denial of a supervisory or management position to any person based upon that person's religious beliefs or practices;

(g) requiring, soliciting or suggesting the participation in Bible studies or other religious exercises or practices on the part of any employee;

(h) taking adverse action against any employee who does not participate in Bible studies or any other religious exercises or practices because of that non-participation;

(i) taking any adverse action against any employee who objects to the religious practices or exercises of management or of any other employees because of their objection(s) thereto; and

(2) Discriminating against any person on the basis of marital status, including:

(a) refusal to hire any person because of marital status;

(b) requiring any prospective employee to furnish information pertaining to marital status;

&ast; &ast; &ast; &ast; &ast; &ast;

(3) Discriminating against any person on the basis of sex, &ast; &ast; &ast;.

Appellants appealed this order and on May 17, 1985, the Minnesota Supreme Court ruled that the ALJ's order pursuant to the Human Rights Act did not violate appellants' rights of free speech, free exercise of religion and freedom of association. *Sports & Health Club*, 370 N.W.2d 844.

On January 30, 1986, the trial court issued an order enforcing the ALJ's April 26, 1984, order and once again enjoining appellants from engaging in the discriminatory employment practices enumerated in the ALJ's order. A hearing was held on February 12, 1986, for appellants to show cause why they should not be held in contempt of court for violation of its January 30, 1986, order.

Arthur Owens and Marc Crevier testified at the contempt hearing. Owens stated that he believes God is the head of their corporation and the Bible is their corporate manual. Owens testified that in keeping with these beliefs only "growing Christians" can hold management positions. He said a person's religious views and beliefs are crucial to whether he or she is promoted. All management personnel are required to attend Bible studies for managers and such study is also "suggested" for other employees. Owens indicated there had been no promotions to a management position since the January 30 order. However, he stated he would not comply with the portion of the order directing him to promote employees into management positions without regard for their religious beliefs.

Owens testified that in an attempt to comply with the supreme court decision, appellants began in September 1985 to distribute a "preemployment statement" to everyone applying for employment. The preemployment statement reads in part:

This explanation of the philosophy of the Sports & Health Club, Inc. is presented in order to allow you to decide if our company has the type of environment you would be comfortable working in.

&ast; &ast; &ast; &ast; &ast; &ast;

We will not knowingly hire anyone, whether they claim to be Christian or not who is openly violating the word of God or the laws of the State through immoral behavior. (Examples: 1 Corinthians 6:9 & 10; "Sodomy"-Minnesota Statute 609.-293; "Fornication"-Minnesota Statute 609.34.) The Sports and Health Club is not looking for that kind of representation.

Since the business is run as a discipleship for Christ, all those in management positions making decisions for the Company's direction are growing Christians. We pray for all of our employees regularly in generalities. If its [sic] a non-Christian the only prayer we would have for them is that they might come to know Jesus Christ. If the request for prayer from a Christian is Biblically sound, we would join them in that prayer. We ask all Christians that work here to pray for us, and to pray for the leadership we give the company. But more

importantly, for the impact we make for Christ as a company in the community. Since we live in a pluralistic society some prospective employees undoubtedly would find our environment offensive to them. We've been told this. Some get irritated that we give the Lord the credit for our business success or the fact that we have Bibles in the lobby of our clubs. Our desire is that the Sports & Health Club not be a burden to any employee and that no prospective employees come into a potential work situation with "blinders on". We want to be totally open about our stand for Jesus Christ and the business climate at the Sports & Health Club.

If none of this gives you a problem, sign the request for employment application at the bottom of this page. For those who may be intolerant of our religious convictions or feel that the Sports & Health Club environment is not for them, we never the less [sic] appreciate your thinking of us.

Owens acknowledged that the kinds of people appellants wished to exclude in 1983–84 are the same people they hoped to exclude with the preemployment statement, that is anyone who is antagonistic to God and might object to the appellants' religious beliefs. When asked if this screening method differed from the questions that were asked previously Owens stated:

Only to the point that now they are reading about us and make a decision whether they want to apply for work or not. Before it was done verbally.

Because the statement is usually distributed by a secretary, neither Owens nor Crevier knew if any potential applicants had left after reading it. Owens stated he intended to continue using the preemployment statement.

Owens also testified that it still would not be unusual during an interview to ask an applicant questions about whether he or she reads the Bible, goes to church and believes in God. Crevier also stated that he still asks applicants if they go to church and read the Bible. Owens said they could still ask a female applicant if she was working with her father or husband's permission. He stated, however, that the preemployment statement usually takes care of this. Owens further stated that if an applicant refused to answer questions on marital status appellants would refuse to hire that person because it is critical that all employees be open and honest. Owens said that while they could ask questions on this aspect, the preemployment statement usually deterred anyone who would not answer the questions and made clear that they will not hire anyone living with another person in violation of state law.

Finally, Owens stated that it was impossible for him to comply with the court's order because of his religious beliefs.

He testified as follows:

[Mr. Jamar] If it is the decision of this Court to hold you in contempt, would you then comply with the orders?

[Mr. Owens] No, sir.

[Mr. Jamar] And why not?

[Mr. Owens] Because of the [Bible] passage I just read.

[Mr. Jamar] If the United States Supreme Court were to review the case and were to decide against you, would you then comply with the orders?

[Mr. Owens] No, sir, * * *.

In an order dated February 24, 1986, the trial court ordered appellants to comply with its January 30 order and levied a fine of $300 per day beginning on February 24, 1986, until appellants were in compliance.

## ISSUES

1. Do the trial court's orders unconstitutionally deprive appellants of their first amendment rights?

2. Does the evidence support the trial court's finding that appellants violated its January 30 order?

3. Did the trial court's order provide adequate notice of the acts prohibited?

4. Did appellants establish a legally recognized justification for their failure to comply with the trial court's order?

5. Are contempt proceedings only available to private parties?

6. Did the fine levied by the trial court violate Minn.Stat. § 588.10?

## ANALYSIS

### I.

Appellants argue that the trial court's January 30 order upholding and enforcing the ALJ's order unconstitutionally infringes on their first amendment rights to freedom of speech, association, religion and press.

The ALJ's order enforced by the trial court was the same order reviewed by the Minnesota Supreme Court in *Sports and Health Club*, 370 N.W.2d 844. Appellants argue that the supreme court only addressed their freedom of religion issue and not the freedom of speech and association issues also raised on that appeal. However, the supreme court specifically stated the issue to include all three claims.

> We come then to the crucial issue: do the findings of fact, conclusions of law and orders of the hearing examiner unconstitutionally infringe upon Sports and Health's freedom of speech, free exercise of religious beliefs and freedom of association * * *.

370 N.W.2d at 850. In a footnote the court noted that:

> Both parties to this action have discussed in briefs and argument these three claims together. Although they are three distinct and separately guaranteed rights, the exercise of free speech in this case was pursuant to a deeply held religious conviction and the associational freedom that was exercised by Sports and Health was motivated by the same deeply held religious beliefs.

*Id.*

■ We conclude that the specific language in *Sports & Health Club* encompasses the freedom of speech, free exercise of religion, and freedom of association issues appellant raises here and has become the law of the case. We will not reexamine or readjudicate these issues in this appeal.

*See Lange v. Nelson-Ryan Flight Service, Inc.*, 263 Minn. 152, 155, 116 N.W.2d 266, 269 (1962).

■ Appellants also argue that the trial court's finding that their preemployment statement violated the trial court's order, abridges their right to freedom of the press. Even assuming that the trial court's order was found to abridge appellants' freedom of the press, we believe the supreme court's decision in *Sports and Health Club, Inc.*, 370 N.W.2d 844, leads to the conclusion that any abridgment was constitutional. In that decision the supreme court determined that even though the ALJ's order enforcing the Minnesota Human Rights Act abridged appellants' right to freedom of religion, there was an overriding and compelling governmental interest in prohibiting discrimination in employment. *Id.* at 852–53. The supreme court noted that appellants' exercise of free speech and association was motivated by their deeply held religious beliefs.

Appellants' motivation for printing and distributing the preemployment statement also originates in their religious beliefs. Owens testified several times at the contempt hearing that the purpose of the preemployment statement was to screen out the same people they had been screening out before by replacing the interview questions with this statement. He also acknowledged that the effect was the same except now applicants read about the corporation's beliefs and standards instead of hearing about them. We, too, agree that appellants' "convictions are deeply held, supported in Biblical scripture, and sincere." 370 N.W.2d at 846. However, under the circumstances here present, we cannot conclude that appellants' freedom of press claim would lead to a different result than that produced by their earlier first amendment claims.

### II.

■ Appellants argue that there was no evidence that they had violated the trial court's January 30 order. Our review of

the record shows that there was evidence through the testimony of Owens and Crevier at the contempt hearing to support the trial court's findings.

The ALJ's order, enforced by the trial court's January 30 order, enjoined appellants from "inquiry into the religious beliefs or practices of any prospective employee." Both Owens and Crevier testified that they were still making these inquiries during interviews with prospective employees. Also Owens testified that the preemployment statement they had developed served the same purpose as their questions.

The ALJ's order also enjoined appellants from denying "a supervisory or management position to any person based upon that person's religious beliefs or practices." Owens testified that no promotions had occurred since the January 30 order, but the policy of promoting only "growing Christians" was still in effect, and that appellants would not comply with the court's order on this matter. The order also prohibited "requiring, soliciting or suggesting the participation in Bible studies * * * of any employee." Again, Owens testified that managers are required to attend Bible studies and appellants suggest that other employees also attend. Finally, Owens testified that appellants would still inquire into female applicants' marital status and that a refusal to answer such questions would bar their employment.

### III.

Appellants argue that they perceived the preemployment statement to be simply an expression of their philosophy and beliefs and that the trial court's order did not give them adequate notice that such a statement was prohibited. Therefore, appellants claim the finding of contempt was improper because they did not have proper notice.

▪ In order to impose a penalty for civil contempt for failure to comply with a court's order the order itself must clearly define the action a party must or must not take. *See Hopp v. Hopp,* 279 Minn. 170, 174, 156 N.W.2d 212, 216 (1968). Appellants' claim of inadequate notice fails for two reasons. First, Owens' testimony at the contempt hearing demonstrated that appellants sought to achieve the same effect with the statement as they did with the questions they had previously asked during interviews. Owens acknowledged that the only difference between the two procedures was that before applicants heard appellants describe their policies during the interview, now through use of the written statement applicants read about these same policies.

Second, the trial court's finding of contempt was not based solely on appellants' use of the preemployment statement. The trial court also based its contempt finding on appellants' continuing requirement that management employees attend Bible study classes, and appellants' continuing inquiries during interviews into applicants' religious beliefs and marital status. As noted above, these are clear violations of specific language in the ALJ's order, and we cannot accept appellants' argument that they had no notice this conduct was prohibited.

### IV.

▪ Appellants assert two justifications for their failure to comply with the trial court's order. First, they claim that the January 30 order was unconstitutional and therefore unlawful and they had no duty to obey an unlawful order. We find no merit in this argument. The January 30 trial court order simply enforced the ALJ's order. The Minnesota Supreme Court had declared the ALJ's order to be lawful. *Sports and Health Club,* 370 N.W.2d 844. The January 30 order was clearly lawful.

Appellants also claim that it was and is impossible for them to comply with the order and therefore they cannot be held in contempt. They contend they are unable to perform because of their fear of eternal damnation. In *Hopp v. Hopp,* 279 Minn. at 175–76, 156 N.W.2d at 217, the supreme court distinguished an inability to perform from an unwillingness to perform. In the present case there is no evidence of an actual inability to perform. Rather, appel-

lants have chosen to follow their religious beliefs before the law. Again, we recognize those religious beliefs to be sincere and deeply held. However, that sincerity and depth of belief cannot circumvent or suspend application of duly enacted statutory mandates.

Appellants cite *In re Jenison*, 267 Minn. 136, 125 N.W.2d 588 (1963) for the proposition that religious beliefs can be a basis for the excuse of impossibility of performance and the excuse would be questioned only if the sincerity of the beliefs was questioned. Reliance on *Jenison* is misplaced, however, because the supreme court in that case found that the state's interest in obtaining competent jurors did not override an individual's right to the free exercise of religion. In the present case the supreme court reached exactly the opposite conclusion.

We cannot elevate either excuse asserted by appellants to the status of proper justification for failure to comply with the trial court's January 30 order.

### V.

■ Appellants argue further that the contempt order is invalid because the State was a party in this action and only individuals can be parties to contempt proceedings. Appellants do not cite any law to support this assertion and we are not aware of any statutory or case law that imposes such a requirement.

### VI.

Finally appellants claim that imposition of a $300 a day fine violated Minn.Stat. § 588.10 (1984). That section provides:

Upon the evidence so taken, the court or officer shall determine the guilt or innocence of the person proceeded against and, if he is adjudged guilty of the contempt charged, he shall be punished by a fine of not more than $250, or by imprisonment in the county jail, workhouse, or work farm for not more than six months, or by both. In case of his inability to pay the fine or endure the imprisonment, he may be relieved by the court or offi-cer in such manner and upon such terms as may be just.

Appellants would have us read the statute to limit the trial court's power to punish appellants for contempt of its order to a single fine of $250. Under the facts of this case we do not believe the statute can be read to so limit a court's contempt powers.

■ The power to punish for contempt is an inherent power of constitutionally created courts in Minnesota. *Hampton v. Hampton*, 303 Minn. 500, 502, 229 N.W.2d 139, 140 (1975). The contempt power exists independent of the contempt statutes. *In Re Welfare of R.L.W.*, 309 Minn. 489, 491, 245 N.W.2d 204, 205 (1976). The contempt power is "essential to the effectiveness of all other court powers." *Id.* at 492, 245 N.W.2d at 206. The trial court's broad discretion to impose a contempt sanction is limited to the extent that certain procedural requirements must be met before the sanction is imposed. *See Hopp v. Hopp*, 279 Minn. at 174, 156 N.W.2d at 216–17. In this case all those procedural requirements have been met.

The purpose of fining or incarcerating an individual for civil contempt is to induce future compliance. To adopt the interpretation proposed by appellants would result in placing severe limits on the trial court's ability to induce compliance with its lawful orders. We do not read Minn.Stat. § 588.-10 to so restrict the trial court's civil contempt powers.

■ Minn.Stat. § 645.24 (1984) provides that "[w]hen a penalty * * * is provided for the violation of a law, such penalty * * * shall be construed to be for each such violation." In the present case the record shows there were multiple violations at each of the Sports and Health Club facilities. (At the time of the contempt hearing appellants were operating seven facilities.) Owens testified at the contempt hearing that appellants would not comply with several portions of the trial court's order and would continue to require its managers to attend Bible study, continue to suggest that other employees do so, continue to

promote only "growing Christians" to management positions and continue to refuse to hire anyone with religious beliefs antagonistic to their own. In addition, both Owens and Crevier testified they were continuing the discriminatory employment practices the trial court had ordered them to cease. The existence of multiple contemners in this case allowed the trial court to impose the penalty on each contemner. *See City of Cincinnati v. Cincinnati District Council 51, American Federation of State, County and Municipal Employers et al.*, 35 Ohio St.2d 197, 299 N.E.2d 686 (1973). Under the particular circumstances present here we conclude that the trial court's imposition of a $300 a day fine until appellants comply with its order did not violate section 588.10. Further the fine was within the trial court's broad discretion in exercising its contempt power to induce compliance with its lawful order.

## DECISION

The trial court's January 30 order enforcing the ALJ's order was constitutional. There was sufficient evidence on the record to support the trial court's finding of contempt. Appellants did not prove a legal justification for their failure to comply with the trial court's order. The trial court's order provided adequate notice of what conduct was prohibited. The State was a proper party to a contempt proceeding. The fine levied by the trial court to induce compliance with its order did not violate Minn.Stat. § 588.10.

Affirmed.

CRIPPEN, J., dissents.

CRIPPEN, Judge, dissenting.

I respectfully dissent.

The trial court enforcement order dated January 30, 1986 was lawful, as the majority concludes. Twenty-five days later, in proceedings initiated six days after issuance of the enforcement order, the trial court found that appellants were in contempt of court. The finding of contempt is clearly erroneous, especially in light of the immediacy of the enforcement order. The contempt finding, and the order dated February 24, 1986 should be reversed.

The trial court issued its enforcement order on the last Thursday in January 1986. On the following Wednesday, six days later, counsel for the Commissioner, the respondent, scheduled a hearing upon the accusation that appellants were in contempt of court. This hearing was conducted on Wednesday, February 12, in the second week after issuance of the enforcement order. As might be expected in the circumstances, much of the testimony dealt with the intentions of the appellants. Rather apparently, this testimony was not pertinent to the question of contempt of court, but instead related to the question whether appellants would comply with the enforcement order in the future.

A complete examination of the record shows only two assertions of misconduct germane to the 13 day period between the date of the enforcement and the date of the hearing. First, it was said that appellants continued to conduct Bible studies for managers of Sports and Health Club, Inc.[1] The relevance of these required studies arises solely because of testimony that they were conducted weekly. There is no other evidence a session had been conducted between January 30 and February 12. There was no evidence that any manager chose not to attend or was disciplined. This minimal facet of the case does not support a finding of contempt of court.

Second, the evidence indicated current use of the preemployment statement that was carefully considered by the trial court. There was no evidence as to the actual effects of the statement on any person. The court's discussion of the statement is indicative of its present importance:

> In response to the court's questions, Owens [appellant Arthur Owens] re-

1. Among the 20 prohibitions announced by the administrative hearings examiner and adopted by the trial court, one proscribed "requiring, soliciting or suggesting the participation in Bible studies or other religious exercises or practices on the part of any employee."

peatedly denied that the *intent of the statement* was to exclude certain persons from employment or from holding management positions with the club on the basis of their religious beliefs or practices. The pre-employment statement and the testimony before the court, however, demonstrate the *respondent's intention* to be otherwise. (Emphasis added).

The court went on to observe the conclusion that the statement was a subterfuge designed to circumvent state law and the trial court order. The court expressed its confidence as to the discriminatory effect the statement would have in the future. This analysis may correctly determine whether appellants can continue to use the statement. It is quite a different thing to suggest that the continuing use of the statement, measured for the 13 day period between January 30 and February 12, was contemptuous. Prior contempt of court was not proven.

It is evident that the contempt issue was confused with a general survey of the long-standing practices of appellants and their future intentions. The proceedings on February 12 did not focus as the law required on actual violations of the January 30 order. It is elementary that contempt proceedings have to do with prohibited acts already "clearly defined" and that one accused of contempt must have notice of the court's order "and a reasonable time within which to comply." *Hopp v. Hopp*, 279 Minn. 170, 174, 156 N.W.2d 212, 216 (1968). These demands of the law are part of a cautious approach in the use of harsh remedies in contempt proceedings. It is also significant to note that civil contempt proceedings are aimed at vindication of the authority of the court and its order, not at vindication of the long-standing grievances of a private party or a party's expectation of future grievances. *See id.*, at 173, 156 N.W.2d at 216; 17 Am.Jur.2d *Contempt* § 2.

At the heart of these proceedings is a delicate balancing of conflicting liberties. *See State ex rel. McClure v. Sports and Health Club, Inc.*, 370 N.W.2d 844, 851–53 (Minn.1985). It is wholly appropriate to view the conflict as a china shop into which the bull of hasty contempt proceedings should not be allowed to stray. The law requires the patience of respondent in carefully investigating the facts needed to show actual contempt of court. The law requires that we reverse the present contempt order.